(No. 38575.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* GERALD STANLEY NEMKE, Appellant.

*Opinion filed September 22, 1970.*

SCHAEFER and WARD, JJ., took no part.

ERROL L. STONE, of Chicago, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and RICHARD S. ROSEN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE CREBS delivered the opinion of the court:

Defendant, Gerald Stanley Nemke, herein appeals his second conviction of the crime of murder. In his first trial in 1960 he was found guilty by a jury and sentenced to death. On review before this court (*People* v. *Nemke*, 23 Ill.2d 591), we reversed and remanded the cause for a new trial for the reason that his preliminary hearing had been so unduly restricted that an adequate judgment could not be made as to the competency of his confession. In his second jury trial in the circuit court of Cook County, he was again convicted and this time was sentenced to the penitentiary for a period of not less than 75 years nor more than 100 years. He now reiterates his contentions that his constitutional rights were violated in that the trial court erred in refusing to suppress his purported confessions and

in admitting them into evidence; that further error was committed in refusing to admit certain evidence and in admitting other evidence; and that the prosecution's final argument was so prejudicial as to constitute reversible error.

For purposes of clarity we restate some of the facts set forth in our previous opinion. The murdered girl, Marilyn Duncan, was 16 years of age and a friend of defendant who had just passed his 17th birthday. Admittedly they were together on the evening of April 29. They had purchased a bottle of wine, walked around, talked with friends, and, because it was raining, they finally sought shelter under a canopy beside a factory building where they consumed most of the wine. In his trial testimony defendant testified that he left the girl about midnight, unharmed but intoxicated. She was found that morning, April 30, at 8:00 A.M., where he had left her, brutally beaten, with a broken nose, broken jaw, severe lacerations about the neck, face, and chest, and internal injuries consisting of a subarachnoid hemorrhage, severe bruising of the heart and lungs and lacerations and rupture of the liver. She was taken to a hospital where she died without regaining consciousness on May 1, 1960.

Defendant's formal education ended with one year of high school. His police record admittedly extends back to his tenth birthday and includes larceny of a number of automobiles. On May 2nd he was arrested in a stolen automobile as a runaway from the Marseilles Youth Camp where he had been sent for a previous auto theft. Because the dead girl's wallet had been found earlier that day containing a copy of a birth certificate of defendant's sister he was brought to the police station for questioning about the slaying of Miss Duncan. It is this questioning and his subsequent confessions about which defendant complains.

Complying with our previous direction, a full hearing was conducted by the trial court in which defendant and all

persons involved in the questioning of defendant were heard.

It appears that after he was brought to the station he was questioned for approximately two hours, during which time he admitted being with Miss Duncan but denied harming her, relating in effect the same story as that given later in his trial testimony. Before this statement had been reduced to writing, Chief of Detectives McMahon came to the room, asked the other officers to leave and took over the interrogation alone. After some preliminary exchanges of personal background between the detective and defendant, defendant admitted killing the girl. He then proceeded to outline in detail all his activities on that night and on the following days of his flight until his arrest. Contrary to his trial testimony that he left the scene about midnight without harming her, he stated that after necking for awhile he wanted to get her, so he started to take off her clothes and when she fought and resisted him he hit her with his fist, got mad, kicked her at least ten times, just kept kicking and kicking until the toe of his shoe softened and turned up, and he picked up three or four bricks and threw them at her repeatedly, hitting her perhaps six or seven times. He then left momentarily but came back and took $4 from her wallet and tossed the wallet away. The next two days he spent roaming and stealing cars until his arrest.

According to Chief McMahon, defendant made his first admission of guilt shortly after 7:30 P.M., and then, about 8:30 P.M., after having listened to all the details, he called in three other detectives so that defendant might verify his confession to them, which defendant did. He was then taken to the State's Attorney's office where, without protest of any kind, he repeated his confession in the same detail in response to questions asked by an assistant State's Attorney and dictated to a stenographer. He was then taken back to the station for finger printing, and about 1:00 A.M. or 1:30 A.M., he was taken to the scene of the crime where he re-enacted it. That morning he was taken to Boys Court

about 9:00 A.M. where, in response to a newspaperman's question as to whether he had killed the girl, defendant replied, "Yea, I kicked her to death."

The record reveals that at no time during defendant's questioning, either at the police station or later at the State's Attorney's office did he complain of weariness, nor is there any contention that he was subjected to any third degree methods or physical abuse. Rather, objection is made to the kindness of Detective McMahon, the alleged "protective" technique he used, his ingratiating manner veiling a threat to turn defendant over to the other officers if he didn't cooperate. In effect, defendant argues that he was subjected to psychological coercion which in view of his youth and inexperience, his alleged weariness and hunger, caused him to succumb and admit to facts which the police planted in his mind.

In addition, defendant contends, and his contention is borne out by the record, that he was never advised of his right to counsel and that, in fact, even before his first admission, he was denied access to counsel who had been retained by his mother and who was present in the police station demanding to be allowed to confer with defendant. Defendant argues that this denial of access to counsel is such a serious infringement of his constitutional rights that it renders his alleged confession inadmissible *per se*. In effect, this is the rule in *Escobedo* v. *Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, and in *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, but defendant here was tried and retried prior to these decisions and neither rule enunciated therein is applicable. They have been specifically held not to be retroactive, but nonetheless factors to be considered in the test of voluntariness. *Johnson* v. *New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772.

First, we might say that we cannot accept the distinction made by the State that the mother of a 17-year-old defendant and not the defendant himself requested and re-

tained counsel. Rather, the question to be resolved is whether the denial of access to counsel and other attendant circumstances so deprived defendant of that fundamental fairness essential to justice that his purported confessions can be held involuntary. As stated in our previous opinion in this case, it presents the recurring problem in the administration of criminal justice of reconciling the responsibility of law enforcement officers to solve crimes against our social order with the right of the criminal defendant, however guilty, to be tried according to constitutional requirements.

In *Crooker* v. *California*, 357 U.S. 433, 2 L. Ed. 2d 1448, 78 S. Ct. 1287, which was cited with approval in *Johnson* v. *New Jersey* as an example of pre-*Escobedo* rule, it was held that not every denial of access to counsel is *per se* a denial of a constitutional right without regard to the other circumstances of the case, and that the sum total of circumstances therein negated any finding of prejudice in view of defendant's maturity and knowledge of his rights. The facts presently before us differ substantially in that the defendant is a boy of 17, but the question posed is the same. Was the purported confession voluntary or involuntary in the light of all the circumstances? It may be that had counsel had an opportunity to talk to defendant he might not have made any statement whatsoever, but that is not pertinent to the inquiry of whether the statement he did give was voluntary under the circumstances. We therefore hold that in this instance denial of access to counsel in and of itself did not constitute such a denial of a constitutional right so as to render defendant's confessions inadmissible.

Voluntariness presupposes a willingness to talk uninfluenced by force, coercion, promise or intimidation of any kind. Here defendant contends that he was tired, frightened, felt panicky and had given up hope, and that the statements he gave were not the truth but had been manufactured by him from accounts he read in the newspaper and from facts implanted in his mind by the police. The facts elicited at

the hearing on his motion to suppress belie these conclusions. At no time did he give any evidence of tiredness, fright or panic. With his record he was not unaccustomed to talking to police officers nor, as he stated, did he want to talk to his mother. Upon making his first general admission that he had killed the girl, within a little over two hours after his arrest, he then supplied a myriad of details in a matter-of-fact, calm manner, and then proceeded to restate the same details to three other officers and subsequently to the assistant State's Attorney. He reenacted the crime and then the next day, though he now denies it, a newspaper reporter stated that in reply to his question defendant replied that he had kicked the girl to death. He was furnished with cookies, sandwiches, milk and cigarettes during the course of his interrogation, and, by his own admission, he had had a number of sandwiches, soda and coffee during his two days of flight and slept periodically as was his custom in the homes of friends and in stolen automobiles. The police denied that defendant's mother had called during his interrogation, but nonetheless the only claim made is that an officer told him that his mother was on the phone and that she wanted him to tell the truth. This can hardly be said to constitute coercion or amount to a threat. Officer McMahon denied defendant's claim that he threatened to turn him over to three other officers if he did not confess, and further denied that he had ever promised him leniency.

As stated in our first opinion in this case the question of competency and voluntary nature of a confession is for the trial court and in making its decision the court is not required to be convinced of its voluntary character beyond a reasonable doubt. And on review the decision of the trial court will not be disturbed unless manifestly against the weight of the evidence or unless the court has clearly committed an abuse of discretion. (*People* v. *Spencer*, 27 Ill.2d 320; *People* v. *Sims*, 21 Ill.2d 425; *People* v. *Miller*, 13

Ill.2d 84.) In *People* v. *Cocroft,* 37 Ill.2d 19, the confession of a 17-year-old boy with an 8th grade education was held voluntary, the court stating that his testimony was lengthy and his cross-examination substantial, thereby affording the trial court sufficient opportunity to observe and evaluate his age, education, intelligence, experience and ability to comprehend the significance of his statement.

Applying these rules to the case before us we find that the decisions of the trial court in denying the motion to suppress and in admitting the confessions into evidence were not against the manifest weight of the evidence, nor did the court abuse its discretion in assessing the credibility of the witnesses and in determining the competence of defendant. To the contrary we find his rulings overwhelmingly supported by the evidence. The age, education and experience of defendant and the fact that he was denied access to counsel were all factors to be considered, but no one of them is solely determinative of the issue. Paraphrasing the language of *People* v. *Spencer,* 27 Ill.2d 320, we have considered all of the circumstances and we find nothing in defendant's detention and questioning which exceeds standards of justice or which was in excess of what is reasonable in a murder investigation.

Defendant next contends that the trial court committed reversible error in allowing Dr. Petrus to testify as to the presence of motile sperm in vaginal slides prepared by Dr. Pochly after the latter's examination of Miss Duncan the morning she was admitted to the hospital. He argues that there was a failure of proof as to the "chain of possession" as the nurse who delivered the slides from one doctor to the other was not called to testify. However, the slides about which Dr. Petrus testified were positively identified by Dr. Pochly as the slides which he had prepared in his examination of Miss Duncan and under such circumstances, where there is no evidence or claim of tampering and the doctor's

positive identification of the slides was not impeached on cross-examination, his testimony, and even the slides themselve if they had been presented, was properly admissible. *People* v. *Fisher,* 340 Ill. 216.

On this same subject defendant also questions the relevancy of the vaginal slides, stating that though they tended to prove intercourse the testimony did not rule out, nor was defendant permitted to prove, the possibility that the sperm could remain motile for a period of time in excess of the time defendant was with Miss Duncan; that the jury, therefore, could have been confused and denied the opportunity to consider the possibility that the girl may have had intercourse with someone other than defendant. The test of admissibility of evidence is whether it fairly tends to prove the particular offense charged and any circumstance may be put in evidence which tends to make the proposition at issue either more or less probable. (*People* v. *Galloway,* 28 Ill.2d 355.) Here rape as well as robbery and murder were charged in the indictment and in addition to the other evidence admitted, *viz.,* defendant's confessions, the ripped and torn clothes, the naked body, all of these, and the presence of sperm, were of probative value and relevant to a determination of the issue. As to the life expectancy of sperm under a variety of conditions it is sufficient to say that counsel ably brought this point to the attention of the jury in his extensive cross-examination of the medical witnesses and there is no sound reason to believe that the jury was confused or misled.

Next contended by defendant is that error was committed in the court's refusal to admit evidence of the deceased girl's poor reputation for chastity. He cites *People* v. *Collins,* 25 Ill.2d 605 to the effect that "since want of consent on the part of the complainant is of the essence of the crime of forcible rape, and must be proved by the prosecution beyond a reasonable doubt before there can be a legal

conviction of the crime, it is permissible, in order to show the probability of consent by the prosecutrix, that her general reputation for immorality and unchastity be shown." This rule presupposes that the accused admits having had intercourse but denied that he used force, or denies that he had intercourse but argues that even if he had wanted to he would not have had to use force. Under the circumstances, here, however, defendant admitted having intercourse in his oral confession but denied it in his trial testimony and, considering this fact with the evidence of ripped and torn clothes and the brutally beaten body of the girl, there is no real issue of consent. We therefore find the refusal to admit evidence of a poor reputation for chastity did not constitute prejudicial error.

Defendant's final contention is that the closing argument of the prosecution was prejudicial because of inflammatory comments of the prosecutor and erroneous statements made by him which were not contained in or supported by the record. We have examined the final arguments in detail and we find that though some of the prosecutor's remarks were intemperate and could have been better left unsaid, nonetheless this was a brutal and vicious murder and to so describe it was not improper. As to alleged erroneous statements and personal references not in the record the jury was properly instructed to ignore such statements of counsel and to be governed solely by the evidence introduced before them. Under the circumstances of this case and considering the closing arguments in their entirety we find that the remarks about which complaint is made were not of such nature as to have influenced the jury in a manner that resulted in substantial prejudice to the accused. *People* v. *Stahl,* 26 Ill.2d 403.

It is the conclusion of this court, after having given full consideration to the many and well argued contentions of counsel, that the defendant has received a fair and impartial

trial which, though not perfect, was free from prejudicial error, and that the jury's verdict was fully supported by the evidence.

The judgment of the circuit court of Cook County is therefore affirmed.

*Judgment affirmed.*

SCHAEFER and WARD, JJ., took no part in the consideration or decision of this case.