THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROY BUNTING, Defendant-Appellant.

(No. 58515;

First District (4th Division)—February 20, 1974.

Michael W. Coffield and Peter J. Mueller, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Barry Rand Elden, Jonathan B. Gilbert, and John M. Cutrone, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Roy Bunting, went to trial on a four count indictment charging him and two others, Gilbert Mims and Jeffrey Dixon, with three counts of murder, including one of felony murder, and one count of armed robbery. Gilbert Mims was tried separately and found not guilty. Jeffrey Dixon was never brought to trial.

Following his arrest, the defendant made an oral statement to police admitting his involvement in the robbery-murder with which he was charged. Subsequently, he signed a typewritten statement in the State's Attorney's office. A motion was made by defendant's attorney to suppress the confessions prior to trial. The motion was heard and denied. Defendant then waived trial by jury and was found guilty in a bench trial as charged. He was sentenced to serve not less than thirty years and not more than sixty years in the Illinois State Penitentiary on the murder

conviction. The trial judge held that the offense of armed robbery was part of the same act and did not sentence him on that charge.

The defendant argues in this appeal that (1) the confession should not have been used as evidence against him at trial because it was coerced and obtained without constitutionally required procedures and warnings and (2) the failure of his appointed counsel to call material witnesses deprived him of adequate and competent counsel and the court's denial of his *pro se* request for substitution of counsel was an abuse of discretion.

The record reveals that Michael Rose, the victim of a robbery-murder, was employed by Hillman's Company. He was vested with the responsibility of picking up pay envelopes at the Hillman's Food Store on Washington Street in Chicago and delivering them to the Hillman's produce center warehouse on South Martin Luther King Drive. Rose Bertrand, the main cashier for Hillman's testified that Michael Rose picked up pay envelopes containing a total of approximately $1600 in cash at the Washington Street store between 10:30 and 11:00 on the morning of May 20, 1970. Upon information received, Officer James Maziarka at approximately 3:45 P.M. on the same day discovered Michael Rose slumped in the front seat of a Chevy station wagon, with a bullet through the back of his head. According to the officer, "he had been dead for some time." The pay envelopes were no longer in his possession.

Robert Blakely testified that he worked as a truck loader at the Hillman's produce center warehouse on King Drive. He said that he was paid in cash on Wednesdays, that he knew Michael Rose, and that Michael Rose would deliver the pay envelopes to the produce center. He testified that he was not paid on Wednesday, May 20, 1970. When he finished work that afternoon, he had occasion to visit his aunt's house at 2350 South State. Upon arriving he observed squad cars and Michael Rose's station wagon in the alley of the 2400 block of South State. Blakely further testified that the following day he saw the defendant, Roy Bunting, whom he had known for about nine years, sitting on a bench at 2611 South Calumet. He testified the defendant said to him "You didn't get paid today, did you?" Blakely asked him how he knew and he replied, "Because we robbed, we got the checks and we robbed Michael Rose."

Officer Dale Buehler testified that he and Officer John Ferguson arrested the defendant on June 17, 1970, without a warrant and took him to Area I Homicide Headquarters at 5101 South Wentworth Avenue. Defendant was advised of his constitutional rights and questioned by Officer John Fitzgerald. After approximately half an hour defendant

orally admitted his involvement in the robbery-murder. He was then transported to the office of Assistant State's Attorney John J. McDonnell, who took a written statement from him.

The defendant's first argument on appeal is that the denial of his motion to suppress the confession and the admission of the confession into evidence was error. This extensive argument can be distilled into three parts: First, that the warnings the defendant received prior to interrogation, as required by *Miranda v. Arizona,* 384 U.S. 436, were inadequate; second, that defendant did not adequately waive his right to counsel; and third, that the sum of the attendant circumstances, including claimed police threats and promises and the defendant's "drugged, drowsy, and uncomfortable condition" during his questioning, rendered his statements involuntary.

Before considering these contentions, we note that it is also urged in defendant's brief at one point in passing, without elucidation, that his warrantless arrest was illegal. This is apparently based in part on his testimony at the hearing on the motion to suppress the confession that the police told him that they wanted him to accompany them to the police station in connection with some trouble his younger brother was having at school. Defendant's mother, who directed the police to his whereabouts, testified at the hearing that the police told her that a car was stolen and they wanted him to identify someone else. The arresting police officers testified that they informed the defendant that he was being taken into custody for investigation regarding the homicide of Michael Rose.

■■■ We find no merit to the cryptic assertion that the defendant was arrested illegally. The police may arrest without a warrant when a criminal offense has in fact been committed and they have reasonable grounds for believing that the person to be arrested has committed it. (Ill. Rev. Stat. 1969, ch. 38, par. 107—2.) The evidence supports the conclusion that the police had ample information to reasonably believe the defendant might have committed the homicide before making the arrest, and the defendant, neither in the trial court nor on appeal, specifically questioned that the police had such information.

We turn now to defendant's contention that the warnings given to him before he made a statement do not satisfy the requirements of *Miranda* and that therefore the State failed to prove that his confession was voluntarily given.

After a lengthy hearing on the motion to suppress, the trial judge concluded that the defendant had been properly given the *Miranda* warnings before he gave an oral statement and again before he subse-

quently signed a written one. The evidence overwhelmingly supports this finding.

Dale Buehler, one of the arresting officers, testified that when they were en route to police headquarters he advised the defendant that:

"* * * he had a right to remain silent; that if he did not remain silent that anything he said can and will be used against him in a court of law; that he had a right *to have an attorney present during any questioning;* and that he also had a right if he had no funds an attorney would be supplied for him [*sic*]." (Emphasis added.)

John Ferguson, the other arresting officer, testified that:

"Detective Buehler advised him * * * and * * * he was re-advised by Buehler and Detective Fitzgerald * * * [of] his right to remain silent; * * * *to have an attorney present at any questioning;* * * * to have an attorney appointed for him if he didn't have sufficient funds to pay for the attorney; * * * that anything he said might be used against him at some future court proceedings." (Emphasis added.)

John Fitzgerald, one of the interrogating officers, testified that when he encountered the defendant in the interrogation room at Area I Homicide Headquarters he:

"* * * informed him that he had the right to remain silent, also that if he did give a statement that anything he said could and would be used against him in a court of law. I also told him that he had the right *to have an attorney present in the room during the questioning* and I also told him that if he could not afford an attorney that the State's Attorney's Office would be notified for an attorney to be sent over to represent him. I also told him that if he did give a statement that he could stop the statement anytime he wished." (Emphasis added.)

Assistant State's Attorney John McDonnell testified that he again fully advised the defendant of his rights. The extensive warnings given by McDonnell are part of the written statement signed by defendant, and include the admonition:

"[Y]ou have a right * * * to talk to a lawyer and have him present if you want to make a statement * * * and if you don't have a lawyer, the Court will appoint one for you * * * and if * * * in the middle of the statement you want to stop and talk to a lawyer, you have a right to do that, too. * * * Now, if you don't have any money to hire a lawyer, you know

the Court will appoint one for you, do you understand that ✻ ✻ ✻."

The insufficiency of the above warnings is urged in that they failed to advise defendant that he had the right to consult with an appointed counsel before the questioning began. It is asserted that the clear meaning of the language used by Officers Buehler and Ferguson to inform defendant of his constitutional right to appointed counsel is that the State would pay a lawyer to represent him at some future trial. The Assistant State's Attorney's reference to counsel being appointed by "the Court," in his remarks recorded in defendant's written confession, are also urged as misleading and confusing in this regard. It is further argued that Officer Fitzgerald's admonition that "if [the defendant] could not afford an attorney that the State's Attorney's Office would be notified for an attorney to be sent over to represent him" is misleading because of the reference to the State's Attorney's office as the agency supplying an attorney.

■■ Defendant notes correctly, and we fully recognize, that the *Miranda* decision places the burden on the State's shoulders in regard to statements made by an accused during incommunicado interrogation. (*Miranda v. Arizona*, 384 U.S. 436, 475.) We in no way wish to dilute the right of an accused to be informed of his privilege against self-incrimination and his right to retained or appointed counsel before volunteering a statement. But to argue that the language used here did not convey to defendant that he had a right to consult with appointed counsel "prior to any questioning" is to accentuate form in derogation of substance. Defendant was informed that he had a right to have an attorney present "at any questioning" and "during any questioning," and that if he did not have sufficient funds, one would be appointed for him, and that he need make no statement at all. The clear and undeniable import of this language is that the defendant could consult with counsel immediately if he so desired. As the Illinois Supreme Court stated in *People v. Prim*, 53 Ill.2d 62, 67, 289 N.E.2d 601, 604;

> "*Miranda* does not specify the precise language to be used in conveying the warnings. Certainly the holding of that case does not contemplate a ritualistic recital of meaningless words. Rather it requires an intelligent conveying to the individual involved of the rights set forth in that decision."

In *Prim*, the court rejected an analogous argument and found that where the defendant had been informed that he had "a constitutional right not to give a statement," followed by the advice that he had "a constitutional right to have an attorney present," "he was clearly told that he had a right to have an attorney present at the contemplated in-

terrogation and not at some future time." And "[w]hen defendant was further told that if he could not afford an attorney 'that we [the State's Attorney] would get one for you' he was clearly informed that an attorney would be provided at the interrogation and not at some future proceeding." 53 Ill.2d at 66-67, 289 N.E.8d at 604.

We hold here that the trial court properly found that the defendant was fully advised of his rights as required by *Miranda* before both his oral admissions and his written confession.

■■ It is next urged that the testimony fails to reveal a knowing waiver by defendant of his right to remain silent and to have counsel present. We disagree. Defendant's own reply brief, as well as the State's brief, recites the following language regarding the form of a waiver contained in *People v. Higgins,* 50 Ill.2d 221, 227, 278 N.E.2d 68, 72, *cert. denied,* 409 U.S. 855.

> " 'Once the defendant has been informed of his rights and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them.' *People v. Johnson,* 70 Cal.2d 541, 450 P.2d 865, 876."

The record here shows that after the defendant was admonished regarding his rights, he said he understood them and proceeded to make a statement. There was thus sufficient evidence of a knowing waiver, under *Higgins.*

The final contention relating to alleged error in allowing use of defendant's confession at trial is that it was involuntary because it was elicited by police threats and promises while he was suffering from cold, lack of sleep and the effect of drugs that he had ingested the night before.

■■ We initially note that whether a statement is voluntary depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overborne at the time he confessed. (*People v. Hester,* 39 Ill.2d 489, 497, 237 N.E.2d 466, 472-73.) In making its decision the trial court need not be convinced beyond a reasonable doubt that the confession was voluntary (*Lego v. Twomey,* 404 U.S. 477), and its finding will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *People v. Prim,* 53 Ill.2d 62, 70, 289 N.E.2d 601, 606.

Defendant testified at the hearing on the motion to suppress that both the police headquarters and the State's Attorney's Office were cold and that he shivered while questioned. He said he complained about this but was told that it was not cold and that he had "bad blood." He testified

further that he had been up virtually all night prior to the morning of his arrest, smoking marijuana and "snorting" heroin and that he was still under the effect of these drugs during his interrogation. He said he was first told by Officer Ferguson at police headquarters that the offense "holds the chair." After being taken into another room, Officer Fitzgerald allegedly lulled him by telling him he "need[ed] a friend." He further testified that Fitzgerald said something about a deal and mentioned that there was a $15,000 reward that he would get if he had some knowledge about the crime.

The record also includes the testimony of all the police officers who were present when the defendant was arrested and questioned as well as the testimony of all other witnesses who had been with the defendant from the time of his arrest until the completion of his oral admissions and subsequent signed statement. This testimony fully rebuts the defendant's version of the interrogation. Officers John Ferguson, Dale Buehler, and John Fitzgerald testified that the defendant was fully advised of his constitutional rights and not coerced, abused, threatened, or promised leniency or benefits before he gave an oral confession. They also testified that the defendant showed no signs of fatigue, that the police rooms were comfortable, and that the defendant made no complaints about being cold or of threats or abuse. Edward Hand, security director for Hillman's who was present during most of the defendant's interrogation at the police station, and also present when the defendant signed a written statement at the State's Attorney's office, corroborated the police officers' testimony as to the absence of threats and promises to, or complaints by, the defendant.

Furthermore when the defendant, after having made an oral statement to the police officers at Area I Homicide Headquarters, was transported to the State's Attorney's Office at 26th Street and South California Avenue, he was questioned by Assistant State's Attorney John J. McDonnell, who was chief of the vice and gambling unit. The record shows that McDonnell had been with the State's Attorney's office since February, 1969. Immediately prior to that he was the deputy chief of the criminal division of the United States Attorney's office for the Northern District of Illinois. Before that he had been an assistant public defender in the criminal court of Cook County. McDonnell testified that he first asked the defendant if the police advised him of and if he understood his constitutional rights, and he answered affirmatively. He then orally advised him again of his rights before proceeding with any questioning. Defendant again acknowledged that he understood his rights and that he wanted to make a statement. He did so and the confession was taken by a court reporter and subsequently read and signed by him. Mc-

Donnell further testified that the defendant made no complaints of being threatened or mistreated by the police. No promises of leniency or benefits were made to him to induce him to give a statement. He seemed normal. He showed no signs of fatigue or nervousness and was cooperative.

■■ We recognize that voluntariness presupposes a willingness to talk uninfluenced by force, coercion, promise or intimidation of any kind. (*People v. Nemke,* 46 Ill.2d 49, 55, 263 N.E.2d 97, 100.) Although the defendant asserts that such influences existed, the totality of the evidence belies his charges. The testimony of all those present during his interrogation and oral and signed confessions indicates that the defendant voluntarily related his participation in the robbery in a matter-of-fact manner and was not promised any reward or leniency, nor threatened. The trial judge who saw and heard the witnesses testify was in a superior position than we and could better evaluate and weigh the evidence. His finding that the defendant's statements were made voluntarily is supported by the evidence and clearly not contrary to its manifest weight. In view of our holding, we need not discuss the many cases cited by defendant for the proposition that where an oral confession is unlawfully obtained it taints and renders inadmissible a later written confession.

Defendant next contends that he was not represented by competent trial counsel, as evidenced primarily by his appointed counsel's failure to subpoena certain witnesses, and that the court's refusal to allow him counsel of his choice constituted a violation of his constitutional rights.

The record reveals that counsel for the defendant was appointed by the court and filed his appearance on July 13, 1970. Various continuances occurred and pre-trial motions were made. Extensive hearings on the motion to suppress the confession were heard on October 13 and 14, 1970. When the case in chief was called to trial on Thursday, October 15, defense counsel apprised the court that his witnesses failed to appear despite promises on their part to do so. He moved the court to continue the case for a week. The trial judge asked if he had subpoenaed the witnesses and he replied: "No, I haven't, Your Honor. I have reason [to believe] that a witness compelled to be in here may be worse for the defendant than no witness at all." The judge then indicated that, since the State's case would take both Thursday and Friday to be presented, and the defense would not have to present witnesses until the following Monday, the case might proceed immediately and the defense would still have four days to elicit the witnesses' cooperation. Defense counsel responded:

"I understand, Your Honor, except that the cooperation I was hop-

ing to elicit from these witnesses seems to me goes to the heart of the case and it is difficult for me to prepare a case unless I have some idea of how cooperative they will be, how much information they are willing to lean to our side so I can best be prepared for the prosecution."

He then stated that he had known of these witnesses for about two months. He had visited their homes and they had all agreed to appear but failed to do so. He urged that, instead of proceeding with the State's case, the trial be continued because:

"* * * unless I'm fully apprised of the information and co-operation that my witnesses may be able to afford I'm at a loss to know how I will be able to protect my client * * * [o]n the initial cross examination or even on direct * * *."

After further colloquy the court, in compliance with defense counsel's wishes, continued the matter to Tuesday, October 20 at 1:30 P.M. with subpoenas.

When the cause was called for trial on Tuesday, defense counsel informed the court that the defendant had just told him that he was dissatisfied with the representation given him and that he had a request to make of the court. The defendant then said "I want another lawyer." This was the first time he had made such a request. The State argued that it was "simply a dilatory tactic to avoid his judgment day" and opposed any further delay. The defendant said he did not feel he was getting the right representation because his lawyer told him it was the first experience he had with a murder trial. This prompted the trial judge to ask Lance Haddix, appointed counsel, to relate his experience. Haddix had been a lawyer for five years. For four of those years he had numerous voluntary assignments from the Chief Judge for indigent defense work, post-conviction proceedings, and the like. He had been involved with criminal cases for three years and had tried approximately forty of them. The judge concluded that Haddix had considerable trial experience in criminal matters and expressed the view that he was satisfied with his competence, noting that he had demonstrated his attention to the case, and that if there was anything during the subsequent trial of the case that supported defendant's position he (the judge) would be the first to stop it. Haddix then commented that it would be difficult for him to proceed without the whole-hearted cooperation of his client and "if we are going to be working at cross purposes I really think this goes to [the] heart of whether he will get representation of any sort." The judge could see no evidence of lack of cooperation, but asked the defendant if he had another lawyer available. He replied that his mother was "working on someone" he might be able to get, but defendant's

mother, in response to the judge's inquiry, admitted that she had not made any effort to secure one. The judge, finding no evidence of "cross purposes," ordered the trial to proceed. The judge then asked if defense counsel had any other witnesses, besides the defendant's mother whom he decided not to call, so that they could be excluded from the courtroom while not testifying. Mr. Haddix responded:

> "I had determined that there were no witnesses who would be willing to testify and was of the opinion that hostile witnesses would be more damaging to our case than subpoenaed witnesses. I had expressed this likewise to Mr. Bunting. He seemed to agree but perhaps at this point he has other thoughts about it."

We are in accord with the trial judge's view of the competency of defendant's counsel. Although, as the defendant points out, it is "the duty of the trial court to see that counsel is assigned who has sufficient ability and experience to fairly represent the defendant, present his defense and protect him from undue oppression" (*People v. Morris*, 3 Ill.2d 437, 445, 121 N.E.2d 810, 815), we find no violation of that duty here. Defendant has failed to establish either actual incompetence or substantial prejudice, both of which must be indicated before reversal will be warranted on the ground of inadequate representation. (3 Ill.2d at 449, 121 N.E.2d at 817.) See also *People v. Newell*, 48 Ill.2d 382, 268 N.E.2d 17; *People v. Harper*, 43 Ill.2d 368, 253 N.E.2d 451.

The defendant relies "principally" on the above cited *Newell* case, which he reads as implying that reversal would be warranted where defense counsel fails to call a key witness. Aside from the distinguishing features of that case, such reliance is improvident in the sense that adequacy of counsel must be determined "solely from the circumstances of each particular case." (*People v. Francis*, 356 Ill. 74, 77, 190 N.E. 106, 107.) Here there is no evidence that defense counsel's failure to call certain witnesses was based on anything other than the exercise of studied judgment and discretion. The statements of counsel in urging a continuance clearly indicate that he felt that the witnesses' testimony would be crucial only *if their cooperation could be obtained*. He spoke of "information and cooperation that [the] witnesses *may* be able to afford," and of his desire to determine "how much information they are willing to lean to our side." (Emphasis added.) His final judgment after interviewing them was that their compelled testimony would be more damaging then helpful and he chose a course of action he believed would be in his client's best interests. His client "seemed to agree" with this decision, although he might have had "other thoughts about it" at the last moment before trial.

■■ In *People v. Martin*, 44 Ill.2d 489, 256 N.E.2d 337, the defendant

was convicted of murder. On appeal he contended that his appointed attorneys' failure to call an alibi witness and another witness who could testify to the lack of credibility of a State's witness deprived him of adequate representation. The court affirmed the conviction, finding that the decision not to call the witnesses was based on the exercise of judgment and discretion. In regard to the prospective alibi witness, "the attorneys had observed [his] demeanor over a period of time. The conclusion that the witness might have done 'more harm than good' was certainly an exercise of judgment." (44 Ill.2d at 490, 256 N.E.2d at 338.) And

> "It is well settled that review of appointed counsel's competence does not extend to those areas involving the exercise of judgment, discretion or trial tactics [citation] and this is true even though appellate counsel or the reviewing court might have acted in a different manner." *People v. Wesley*, 30 Ill.2d 131, 136, 195 N.E.2d 708, 711.

We also note that to consider, as defendant urges, the fact of acquittal in a separate trial of co-defendant Gilbert Mims, the alleged trigger man in the instant crime, to buttress the contention that defendant's trial counsel was incompetent, is naive and unjustified. The State's evidence against defendant Bunting, centering around his own admissions to witness Blakely and confession to the police, was without question very strong and convincing and would be difficult to overcome with any counsel, whatever his tactics.

We finally consider the contention that despite assertions of dissatisfaction with his court-appointed counsel, and despite assertions by counsel himself that he was unable to adequately represent defendant because they were at "cross purposes" as to proper conduct of the trial, the trial court perfunctorily denied defendant's request for a change of counsel, and that this amounted to prejudicial error. Defendant relies on *People v. Green*, 42 Ill.2d 555, 248 N.E.2d 116, and *United States v. Seale*, 461 F.2d 345.

In *Green* the defendant requested a continuance on his second trial date for the purpose of being represented by privately retained counsel. In response to the judge's inquiry, defendant said that the retained lawyer was in Washington and that the First Presbyterian Church had paid him. Without further inquiry or attempt at vertification the judge denied his request. The judge then ordered the appointment of a public defender, who had no opportunity to investigate the case. The Illinois Supreme Court reversed defendant's conviction under those compelling circumstances. The *Seale* case is also factually dissimilar to the one under consideration in important respects. Suffice it to say that the relevant holding

of the court in that case was that it was error for the trial judge to refuse to inquire of the defendant about his dissatisfaction with any counsel except one that happened to be hospitalized.

Neither of these cases compel us to find error in the present case. The defendant here requested a change of counsel after having been represented by appointed counsel for three months, after a lengthy hearing on the motion to suppress had been heard and the motion denied, and after the court reluctantly granted the defense a final five-day continuance before the case went to trial. In response to the defendant's objection to the lack of experience of counsel of record, the judge inquired into and was satisfied with his ability to proceed with the case. He nevertheless asked if defendant presently had another lawyer available, and inquired of his mother whether she had made any effort to secure one, whereupon she said she had not. Counsel's own bald assertion of "cross purposes" between himself and the defendant is not supported by any evidence in the record and the judge properly, we feel, determined that none existed.

■■ We feel the trial judge adequately discharged his duty of considering the merit of defendant's request for a continuance to seek change of counsel. The record reflects that his decision to proceed to trial was based on his consideration of the untimeliness of defendant's request, the competency of the appointed attorney, and the defendant's failure to have contacted substitute counsel at that time. (*Cf. People v. Tyson*, 130 Ill.App.2d 140, 264 N.E.2d 403.) Under these circumstances we find no abuse of discretion.

For these reasons the judgment is affirmed.

Affirmed.

ADESKO, P. J., and JOHNSON, J., concur.