THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BILLIE D. BARBER, Defendant-Appellant.

Third District   No. 82—610

Opinion filed July 29, 1983.

768

770

J. Peter Ault, P.C., of Pekin, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

The defendant, Billie D. Barber, was found guilty of the murder and robbery of his ex-wife, Rhonda Barber, following a jury trial in the circuit court of Tazewell County. When the jury failed to impose the death penalty, the defendant was sentenced to natural life imprisonment.

On appeal, the defendant raises nine allegations of error seeking reversal of his convictions or, alternatively, a remand for a new trial, or modification of the sentence imposed.

The evidence adduced at trial consisted of the following.

Robert Yost, the decedent's father, testified that he was staying with his daughter for a few days over the holidays in January of 1982. On January 2 he last saw his daughter alive at noon. Before he left the house, he gave her $20 to buy groceries. When he returned at midnight, he found the house locked. He gained entry to the home by crawling through the front window. Inside he found his daughter's body, the victim of an apparent stabbing, on the floor of her bedroom. His two-year-old grandson, Justin, was alive and apparently unhurt although he had blood on his mouth and pillow. The police were notified immediately.

Gary Graff, a deputy sheriff, arrived and made a sketch of the crime scene. He noticed an area on the door to the decedent's bedroom where no fingerprint powder had adhered. The area was oval shaped, 12 to 15 inches in diameter, about five feet from the floor. He also observed a partial print on the inside frame of the bedroom door leading to where the victim was found. The print was approximately five feet from the floor.

Graff testified that he saw the defendant two days later, on January 4, 1982, at which time he was wearing a gray hooded sweatshirt,

a blue jean jacket and what appeared to be a new pair of blue jeans. The defendant had scratches on his neck and hands and a swollen lip.

The defendant told Graff that he was living with his ex-wife and had last seen her on January 2, when she left to go shopping. He left the home on foot in the afternoon and obtained a ride from three unknown white males in a white Vega. The defendant maintained that he was with these individuals until 9 p.m., during which time they drank beer and smoked marijuana. At approximately 9 p.m. he went to the apartment of Rebecca Martinez and from there to the apartment of Mack Howell, where Rebecca Martinez was watching television.

Graff stated that he went to the Martinez apartment and obtained a pair of blue jeans which the defendant identified as his and which contained the blood of the decedent. The defendant claimed that the blood was from a cut Rhonda had sustained to her finger earlier in the day on January 2, when he had "playfully" taken a knife away from her. The defendant said that the scratches he had were received at a New Year's Eve party from another woman.

Graff recovered two $50 bills and four $20 bills wrapped in a towel from the Martinez apartment. The defendant told Graff that he and his ex-wife had been selling drugs from her home and were expecting a quarter pound of marijuana on the night of her death.

Detective Sergeant Eugene Maxwell testified that he took photographs of the defendant on January 4 depicting scratches on his face, neck, chest, arms and hands. The defendant told Maxwell during the questioning following his arrest on March 5, that "I've got something to say to you, and it might make you mad but I don't want to tell you how I did it until I talk to my lawyer." The defendant also told Maxwell that he had smoked a "dime's worth" of pot during the day and had smoked "a joint" approximately 10 minutes before he was picked up.

Patricia Orr, a forensic scientist, testified as to blood and hair samples submitted and that certain stains on the victim's sweater could have been a mixture of the defendant's and decedent's blood and that blood stains on the defendant's jeans could have been the victim's.

Susan Bruce, a grocery store clerk, testified that the defendant and his ex-wife came into the store on January 2 in order to cash Rhonda's public aid check.

Jackie Bridgmon and Margaret Pedigo saw an individual at approximately 8 p.m. on January 2, 1982, walking along the road in the sleet. Each identified a photograph of the defendant from a group of

photographs as the man they saw.

Belinda Grandy testified that she was a neighbor of the decedent and had gone grocery shopping with her from 2 to 4 p.m. on January 2, 1982.

Dr. Paul Millikin, a pathologist, testified that an autopsy of the decedent indicated multiple bruises, a hairline skull fracture, multiple stab wounds, a large laceration across the throat, and that death resulted from the loss of blood from the multiple stab wounds to heart and lung. The decedent was 5½ months pregnant.

Barbara Blackburn testified that she and her husband had been with the defendant and his ex-wife on New Year's Day and that there had been no arguments between them then. When the decedent's father arrived she saw the defendant go to the back of the house where he would not be seen.

Frank Blackburn, Barbara's husband, testified that the defendant had both marijuana, "pot," and cocaine in the house and that he saw the defendant cutting the cocaine into "dimes" and placing it in tin foil packets. He also testified that when he saw the defendant on January 5, he observed a scratch on his neck which he had not seen on New Year's Day.

Mack Howell testified that the defendant came to his apartment at approximately 9 p.m. on January 2 and that he appeared nervous. The defendant's hair and clothing were wet.

Rebecca Martinez testified that on January 3, she purchased a pair of blue jeans for the defendant at his request and that he paid her with a $20 bill. The defendant wanted Martinez to buy the jeans because she could get a discount from Bergner's where she worked.

Jackie Evans testified that when he was an inmate of the Logan Correctional Center he worked as a legal clerk, which included helping inmates prepare legal documents. Evans had assisted the defendant in preparing dissolution of marriage documents and the defendant wanted to allege adultery as grounds for the action. He told Evans that his wife was living with another man and that she was pregnant by him and that he (the defendant) was going "to kill her." Evans believed the defendant to be serious.

Dorothy Daugherty, the decedent's mother, testified that two years prior to her daughter's death she had seen a letter to her from the defendant in which he wrote that "if he ever caught her fucking around with some bastard, he would kill her."

The State rested its case and the defense testimony included the following:

Detective Sergeant Maxwell testified that his investigation had in-

cluded suspects other than the defendant.

Barbara Blackburn testified that on the day Rhonda Barber died, she told her that the defendant had accepted the fact that she was pregnant by another man and that the defendant wanted to remarry her.

Tonya Beeney, the defendant's sister and roommate of Rebecca Martinez, testified that she saw her brother on January 2 at approximately 9 p.m. and that he changed his jeans to the ones purchased for him by her roommate, Martinez. She noticed that the jeans her brother had been wearing that evening were wet, but noticed nothing else about them. She was with the defendant when he found out about Rhonda's death and he appeared upset, surprised, and he cried.

Rebecca Martinez testified that she saw the defendant at Mack Howell's apartment on January 2 at approximately 9 p.m. and that he told her he had been riding around with some guys earlier in the evening. She noticed that the defendant's hair and clothing were wet but nothing else unusual. She observed scratches on the defendant after the New Year's Eve party.

The defendant testified that he had been in the penitentiary twice for burglary. He had been released December 1, 1981, approximately one month before his ex-wife's murder. He testified he "did not recall" telling Jackie Evans he was going to kill Rhonda, and denied writing any threatening letter to her. He identified a public aid check that he had cashed to buy drugs. He admitted hiding in the bedroom closet when his ex-wife's father came home.

On the night of the murder, the defendant said he was with three strangers and that they told him where they could get some good "pot." They took him back to Rhonda's and he got some money to buy some. They smoked pot, drank beer and rode around until he was dropped off at Becky Martinez' apartment, where he changed into the new jeans she purchased for him. He then went to Mack Howell's apartment which was only two doors away.

The next day he went to the sheriff's department and found out Rhonda had been killed. He was questioned and released and not arrested until March 5, 1982. He denied telling Sergeant Maxwell that he would say "how he did it."

The defendant's first allegation of error concerns the trial court's refusal to suppress the inculpatory statement allegedly made to Sergeant Maxwell.

The defendant denies making the inculpatory statement but contends that if it was made, it was involuntary because of his use of marijuana on the day of his arrest.

■■■ The determination of the issue of the voluntariness of a confession depends not upon any single factor, but on the totality of the particular circumstances in any given case. The question of whether the defendant's will was overcome at the time he confessed or whether the confession was made freely, voluntarily and without compulsion or inducement of any sort, is for the trial court. (*People v. Noe* (1980), 86 Ill. App. 3d 762, 408 N.E.2d 483.) In making its decision, the trial court is not required to be convinced beyond a reasonable doubt. *People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97.

A reviewing court will not disturb the trial court's decision unless it is against the manifest weight of the evidence or unless it constitutes a clear abuse of discretion. *People v. Nemke* (1970), 46 Ill. 2d 49, 56, 263 N.E.2d 97, 101.

■■■ The defendant does not contend that his inculpatory statement was the product of force, intimidation or promise of leniency. We note that the defendant's allegation on appeal that his confession was involuntary due to his marijuana smoking was contradicted by his testimony at trial that such use did not affect his ability to understand what was happening during the questioning following his arrest. There was no evidence from any officer that the defendant was under the influence of drugs or alcohol at the time of his arrest.

It should be noted that the defendant was not unaccustomed to talking with police officers, either in the investigation of this case or because of his experience in prior years.

■■■ While it is true that the State cannot introduce evidence or comment upon the defendant's exercise of his right to counsel (*People v. Johnson* (1971), 2 Ill. App. 3d 965, 275 N.E.2d 649), it is clear here that the inculpatory portion of defendant's statement was made before any request for an attorney was made. For these reasons we believe the trial court properly denied defendant's motion to suppress.

■■■ The defendant contends that the trial court erred in allowing expert testimony as to a possible explanation for the existence and location of physical evidence, *i.e.*, the palm print on the door frame leading to the bedroom where the decedent was found and the oval area on the door which had an unusual absence of smudges and smears.

The trial judge determined that based upon the authority of *People v. Gordon* (1981), 94 Ill. App. 3d 764, 419 N.E.2d 66, it was proper to allow Mr. Dubois, an acknowledged expert, to testify as to a possible explanation of how the position of the palm print on the door frame and the absence of smudges or smears on the door came into existence.

It is well settled that an expert whose qualifications and experience give him knowledge which is beyond the ken of the average juror and whose testimony will aid, and not invade, the province of the jury in reaching its decision, should be allowed to testify. (*People v. Beil* (1979), 76 Ill. App. 3d 924, 395 N.E.2d 400.) Experts, properly qualified, are not limited to a recitation of what they observed, but may express their opinion as to causation. *People v. Gordon* (1981), 94 Ill. App. 3d 764, 768, 419 N.E.2d 66, 70.

The trial judge had broad discretion to determine the qualification of experts and to decide whether their testimony may assist the jury in its deliberations and a reversal is not warranted absent a manifest abuse of this discretion. (*People v. Yancey* (1978), 57 Ill. App. 3d 256, 372 N.E.2d 1069.) We believe the evidence indicates that there was no abuse of discretion in allowing such expert testimony here.

■■ ■ Next, the defendant contends that the trial court erred in denying his motion for a directed verdict on the count of robbery. The State had argued that the defendant took money from the victim which was the proceeds of a public aid check received by the defendant's ex-wife the day she was murdered. The defendant testified that he had been given public aid checks by his ex-wife in the past and had lived off the proceeds since his release from the penitentiary. The actual money found in the Martinez apartment was not admitted into evidence by the trial court due to the fact that it believed it was too remote and speculative to allow the trier of fact to consider the currency as evidence.

The evidence offered no proof to the jury that the defendant took money from his ex-wife by force or against her will, either before or after her murder. *People v. Pack* (1976), 34 Ill. App. 3d 894, 341 N.E.2d 4.

The standard of review for a denial of a motion for a directed verdict is whether the evidence adduced by the People, when viewed in a manner most favorable to the prosecution, establishes a defendant's guilt beyond a reasonable doubt. (*People v. Henderson* (1981), 95 Ill. App. 3d 291, 419 N.E.2d 1262.) We believe there was insufficient evidence here for the jury to have concluded that the defendant was guilty of robbery beyond a reasonable doubt. (*People v. King* (1979), 67 Ill. App. 3d 754, 384 N.E.2d 1013.) Accordingly, the defendant's conviction for robbery must be reversed.

■■ The defendant also contends that the trial court erred in refusing to give his tendered instruction on circumstantial evidence which included the second paragraph of Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.02 (2d ed. 1981) ("facts or circumstances

proved must exclude every reasonable theory of innocence"). We note that the particular instruction tendered by the defendant is not to be given unless the evidence of guilt is entirely circumstantial. Comments to IPI Criminal No. 3.02; *People v. Hill* (1978), 56 Ill. App. 3d 510, 371 N.E.2d 1257.

In view of defendant's clear admission to the police that "he would not say how he did it until he talked to an attorney," there was direct evidence of the defendant's guilt which justified the refusal of defendant's tendered instruction. *People v. Sanchez* (1979), 73 Ill. App. 3d 607, 392 N.E.2d 378; *People v. Brooks* (1972), 7 Ill. App. 3d 767, 289 N.E.2d 207.

■■■ The defendant next contends that the trial court erred in allowing the testimony of Jackie Evans into evidence. Evans was the inmate at the Logan Correctional Center who worked as a legal clerk or jailhouse lawyer. While the defendant was at Logan he asked Evans for assistance in preparing a petition for dissolution of marriage. Defendant told Evans that he wanted a divorce from his wife because he believed she was living with another man and had become pregnant by him. While the divorce proceeding was pending, the defendant told Evans he was going to kill his wife.

The trial court found that since Evans was not a licensed attorney, there was no attorney-client relationship and therefore no attorney-client privilege to conversations between the defendant and his fellow inmate.

The determination of the existence of a privileged communication is for the trial court. (*Gronewold v. Gronewold* (1922), 304 Ill. 11, 136 N.E. 489.) The burden is on the party claiming the existence of the privilege to show that it should be protected. (*In re Estate of Wahl* (1920), 218 Ill. App. 295.) In no way was Evans a "professional legal advisor," nor was the defendant "his client." (*People v. Adam* (1972), 51 Ill. 2d 46, 280 N.E.2d 205.) Therefore, no error occurred in permitting Evans to testify as to certain statements made to him by the defendant.

■■ ■ The defendant further contends that the trial court erred in allowing the victim's mother to testify regarding a threatening letter written by the defendant to her daughter approximately two years before trial, and about two to three months before the defendant was sent to the penitentiary for a prior offense. A month after he was released, his ex-wife was brutally murdered. The vast majority of time in the interim between the origin of the letter and the victim's murder was spent by the defendant in the penitentiary, where the threat could not be carried out.

The defendant's challenge to the admissibility of such evidence on the grounds of remoteness in time or the best evidence rule is not well taken. The issue of remoteness is a question which goes to the weight of the evidence, not its admissibility. (*People v. Mertens* (1979), 77 Ill. App. 3d 791, 396 N.E.2d 595.) The best evidence rule requires that the original document be introduced into evidence unless it is shown to be lost, destroyed or unavailable. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) Here the victim's mother testified that following her daughter's murder, she made a diligent search of her apartment to locate the document but was unable to do so. Her specific recollection of the contents of the letter, her identification of the defendant's handwriting and signature sufficiently established the existence of the document and the prior threat to kill her daughter by the defendant was certainly relevant to the question of his innocence or guilt for her murder.

■■ The admission of the testimonial evidence regarding the existence and source of the threatening letter was also not precluded by the marital privilege, since communications between husband and wife are not privileged where one is charged with an offense against the other. Ill. Rev. Stat. 1981, ch. 38, par. 155—1.

■■■ The defendant next contends that the trial court erred in allowing into evidence certain photographs of the defendant, *i.e.*, one in a lineup where the defendant's middle finger allegedly depicts an obscene gesture and the other showing cuts and scratches on the defendant's neck, hands, face, arms and chest as they existed on January 4, 1982, two days after his ex-wife's murder. Also admitted over defendant's objection was a diagram of the victim's bedroom showing the location of her body and various items in the room at the time the victim was found.

We believe the probative value of the foregoing exhibits is clear and no error occurred in their admission into evidence. Certainly the photographs of the defendant were relevant to show his identification and physical condition shortly after the murder and the sketch, although not to scale and so marked, was no more than corroborative of the crime scene investigation testimony.

■■ Next, the defendant contends he was not proved guilty beyond a reasonable doubt. We disagree. Without restating in this opinion all the facts and circumstances which we believe support the defendant's conviction for murder, we must note in the first instance that the defendant admitted to the police that he killed his ex-wife. Certainly the evidence of defendant's prior threats to kill his wife, the marks on his body immediately after the killing, all suggest not only

that he did it, but that his ex-wife didn't die without a fight. The defendant's blood-spattered jeans which he discarded on the night of the murder, his incredible alibi which the jury obviously chose to disbelieve, all support the lack of a reasonable hypothesis of defendant's innocence.

We believe it is well settled that a reviewing court may not substitute its determination for that of the jury unless it is so palpably contrary to the weight of the evidence or so unsatisfactory as to create a reasonable doubt of guilt. *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827.

■■■ It was peculiarly within the province of the jury to assess the inconsistencies or discrepancies in the testimony, any possible bias or interest affecting the credibility of witnesses and the weight to be attributed to their testimony. *People v. Seiber* (1979), 76 Ill. App. 3d 9, 394 N.E.2d 1044.

In light of the foregoing principles, we are unable to conclude that the verdict of the jury was against the manifest weight of the evidence or so palpably erroneous or unsatisfactory that a reversal is mandated.

■■■ Finally, the defendant contends that the trial court abused its discretion in imposing a sentence of natural life imprisonment.

We note that section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1) provides that such a sentence is appropriate "if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty ***."

The record here indicates that the trial court specifically noted the foregoing provisions of the statute and there is no denial that the evidence in this case clearly supports his decision.

■■■ It is not the province of this court to reduce such a sentence merely as an act of judicial clemency. *People v. Watson* (1982), 107 Ill. App. 3d 691, 438 N.E.2d 453; *People v. York* (1980), 87 Ill. App. 3d 1026, 409 N.E.2d 525.

■■■ The defendant contends, however, that the trial court improperly considered as an aggravating factor that the murder was committed in the course of another felony, to-wit, robbery. We have set aside the defendant's conviction and sentence for robbery, but the question remains whether the case must be remanded for resentencing. If this was the only basis upon which the trial court concluded that a life sentence was appropriate, then a remand would be in order. However, a review of the record indicates that the trial court imposed a natural life term of imprisonment upon the defendant due to

its belief that the murder was "accompanied by exceptionally brutal [and] heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1.

We do not believe the trial court abused its discretion in concluding that the brutal nature of the murder here fell squarely within the scope of our natural life imprisonment statute.

For these reasons, the judgment and sentence of the circuit court of Tazewell County is affirmed in part and reversed in part.

Affirmed in part, reversed in part.

BARRY and HEIPLE, JJ., concur.