(No. 37202.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM SPENCER, Plaintiff in Error.

*Opinion filed March 22, 1963.*

DONALD J. NOVOTNY, of Berwyn, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and EDWARD J. HLADIS and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

Defendant, William Spencer, was found guilty of murder after a bench trial in the criminal court of Cook County and sentenced to life imprisonment. He prosecutes this writ of error contending that the introduction into evidence of a coerced confession denied him due process of law, and that he was not proved guilty beyond a reasonable doubt.

The dismal picture emerging from the evidence shows that on the night of April 1, 1959, defendant was employed as a room clerk in the Casa Blanca Hotel, located at 3139 S.

Michigan Avenue in Chicago. During the early morning hours of that date the decedent, John Scott, entered the hotel in the company of one Louise Davis and registered as Mr. and Mrs. John Brown. Defendant collected the rental of $1.75 and assigned them to Room 3 which was on the main floor at ground level, and could be seen down a hallway from the clerk's desk. Scott and the Davis woman had been brought together a short time before by a procurer-cab driver named John Rose and, a short time later, Rose appeared in the hotel and was directed to Room 3 by defendant. When Rose knocked at the door Louise Davis came out in the hall and gave him $3, which he described as "my part of her fee," and then Rose left the hotel.

In his confession defendant related that Louise Davis left the hotel about a half-hour later while the decedent remained in the room. On seeing this, defendant donned a pair of coveralls in an attempt to disguise himself, obtained a gun he had hidden on the premises and admitted himself to Room 3 by slipping the lock with a knife. He said he found the decedent fully dressed; that he pulled his gun and demanded decedent's money; that the latter cursed him and started for the door; and that he fired two shots, after which the decedent sat down on the edge of the bed and started groaning. Concluding his confession, defendant related that he ran from the hotel and concealed the gun in a garbage can on adjoining premises, returned to the hotel office and took off his coveralls, and then telephoned the police that there was a suspicious character in the lobby.

Police officers who responded to the call found the decedent in Room 3 sitting on the bed, bleeding and groaning, and summoned an ambulance to remove him to a hospital. Another officer sought to question him at the hospital but, after being asked what had happened and replying that he "didn't know," the decedent lapsed into unconsciousness. A medical witness testified that the victim had died of a

hemorrhage resulting from a bullet which entered the body through the upper pole of the right kidney, passed through the liver, and left the body through the left side of the abdomen.

At the trial defendant repudiated his confession and testified that, following the departure of Louise Davis, he was sitting at the hotel desk listening to a radio when he heard a shot fired. He said he did not investigate but immediately took a coin from the cash drawer, telephoned the police, and reported that there had been a shooting. Further, he testified that he had heard a second shot while he was at the telephone and that, within a few seconds, he saw Oscar Crockett, who was occupying Room 7, come out into the hall from his room. After completing his call he went with Crockett to Room 3 where he kicked in the door, found the decedent sitting on the bed and bleeding, and then returned to the lobby to wait for the police.

Crockett testified that he had heard two shots and that he had gone out into the hall 6 to 10 seconds later at which time he saw defendant in the hotel office using the telephone. In addition, he said that defendant was dressed in khaki trousers when he saw him. Other evidence for the defense established that the window in Room 3 was partially open, and that a person standing on the ground outside could see the upper portion of a person in the room. In this regard, officers who investigated at the hotel immediately after the shooting found what appeared to be an old window frame leaning against the building under the window of Room 3, but, according to their further testimony, a dresser sitting in front of the window blocked any view into the room. A witness for the defense, who went to the premises in June, 1959, testified that the dresser did not fully cover the window; that a bullet hole was found in the door frame 49 inches above the floor; and that the bullet had entered the door on an upward angle.

Defendant filed a motion to suppress his confession

from evidence and a preliminary hearing was held by the court on the issue of its voluntary or involuntary character. Facts developed at this hearing show that defendant accompanied the police voluntarily to the station after the initial investigation was completed around the hotel and that he first spent some time looking through photographs in an effort to establish the identity of Rose, the man who had talked to Louise Davis in the hall. Some time in the vicinity of 9:30 A.M. he gave an exculpatory statement and it appears that Crockett was also being questioned at this time. About 12:45 P.M. defendant was placed under arrest and charged with being the keeper of a disorderly house and placed in a cell. Thereafter, the police located Louise Davis and at 6:00 P.M., defendant agreed to take a lie-detector test, as did the Davis woman. Such a test was set up and started at the crime laboratory about 10:00 P.M., but was not completed because defendant complained of feeling faint and asked to lie down on the floor. He was examined by a doctor and then taken to the Homicide Bureau for further questioning.

Despite confusing and at times self-contradictory statements made by defendant, the sequence of events next occurring appears to be that sometime between midnight and 1:00 A.M., defendant orally admitted his guilt and accompanied several officers to the hotel where an unsuccessful search was made for the gun defendant said he had put in a garbage can. Upon their return to the Homicide Bureau defendant's employers, the man and woman who owned the hotel, were at the bureau and defendant admitted to them in the presence of officers that he had committed the murder. Following this, members of the State's Attorney's staff came to the station and took a confession, concluding about 4:30 A.M., which was then transposed by a shorthand reporter and signed by defendant at the office of the State's Attorney later in the day. On the same morning he was examined by the chief police surgeon who

found nothing irregular in defendant's physical condition other than a badly healed hernia scar which he said might cause pain during exertion.

Considering all of the circumstances we find nothing in defendant's detention and questioning which exceeds civilized standards or which was in excess of what could normally and reasonably be expected in a murder investigation. (Cf. *People* v. *Stacey,* 25 Ill.2d 258; *People* v. *Jackson,* 23 Ill.2d 274.) And while defendant may have become faint during the attempt to administer the lie-detector test, we believe it may be accounted for more by the stress created by his own consciousness of guilt and its imminent discovery by the legal authorities, than the conduct of his questioners. Cf. *Stein* v. *New York,* 346 U.S. 156, 185, 97 L. ed. 1522; *State* v. *Smith,* 32 N.J. 501, 161 A. 2d 520, 546.

Defendant testified that his entire period of detention was marked by threats, promises and cajolery in an effort to get him to confess; that he was denied food; that a doctor in the lie-detector room told him he would get lumps in his chest if he did not tell the truth; that a police lieutenant struck him in the head with a clip board on the night he confessed; and that he finally gave in and said what the officers wanted him to because he was afraid of what they would do to him. Apart from the fact each of the officers charged with coercion categorically denied such conduct, defendant's own contradictions and inconsistencies while testifying do much to detract from the vitality and credibility of his charges.

Upon preliminary inquiry into the voluntary nature of a confession, the question of its competency is for the trial court alone to decide and, in making its determination, the court is not required to be convinced of its voluntary character beyond a reasonable doubt. On review, the decision of the trial court will not be disturbed unless manifestly against the weight of the evidence, or unless the

court has clearly committed an abuse of discretion. (*People v. Sims*, 21 Ill.2d 425; *People v. Miller*, 13 Ill.2d 84.) Here, the evidence was not only conflicting but that of defendant was in several material instances contradictory and unsatisfactory. Considering also the superior position of the trial judge to see and hear the witnesses and to assess their credibility, we cannot say that the decision to admit the confession into evidence as one voluntarily given was either against the manifest weight of the evidence or a clear abuse of discretion.

Defendant's contention that he was not proved guilty of the murder beyond a reasonable doubt is predicated upon the evidence which shows that it might have been possible for a person standing outside to shoot a person in the room and, in the main, revolves around the testimony of Crockett that, 6 to 10 seconds after he heard the shots fired, he stepped into the hall and saw defendant using the office telephone. However, the matter of Crockett's credibility was a question for the trial judge, as was the function of drawing reasonable inferences from all the evidence. Further, as opposed to the circumstantial evidence relied upon by defendant, there is the factor that his confession was direct evidence of his guilt, (*People v. Costello*, 320 Ill. 79, 108, *People v. Bretagna*, 298 N.Y. 323, 83 N.E.2d 537, 538, and authorities there cited,) which, in itself, overcomes the circumstantial theories relied upon by defendant and affords proof of his guilt beyond a reasonable doubt.

Considering the record in its entirety we see no basis for disturbing the findings of the trial court either as to the admission of the confession or as to the finding of guilt. We therefore affirm the judgment of the criminal court of Cook County.

*Judgment affirmed.*