**People of the State of Illinois, Plaintiff-Appellee, v. Robert Harris, Defendant-Appellant.**

Gen. No. 51,752.

First District, First Division.

June 10, 1968.

George H. Martens, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Eldridge R. Hersey, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

Defendant, Robert Harris, was found guilty of voluntary manslaughter by a jury and was sentenced to the penitentiary for a minimum of 19 and a maximum of 20 years. On appeal, his principal contention is that his confession should not have been admitted into evidence because it was involuntary, and he had been denied the assistance of counsel. A pretrial motion to suppress any written or oral confession was denied after hearing the testimony of witnesses.

Defendant's trial was held in December 1965. The evidence shows that on February 25, 1963, at about 8:30 p. m., Lloyd L. Daniels, a CTA bus driver, entered the apartment building at 222 South Hamlin, accompanied by his wife, his brother-in-law, Melvin Booker, and his sister, Mrs. Oberia Mason, who lived in the building. When they approached the top landing they saw defendant there with a woman (later identified as Lee Ethel Weathington) seemingly draped over his knee, her head resting on the steps. Mrs. Mason noted that the woman must be "awful sick," and defendant replied, "She is, and she has chills. I'm trying to get her to the hospital." Daniels noticed an open trunk on the next landing and called the police from Mrs. Mason's apartment, and then left the building. Shortly thereafter he returned to the building. The body was on the floor of the vestibule, and defendant was there with two police officers. On inquiry, Daniels told the police that defendant was the man he saw "with the body." The police noticed bloodstains on defendant's clothing. A bloodstained trunk was found on the third floor, and the keys of defendant fitted the lock on the

trunk. Bloodstained newspapers were found in the defendant's apartment. Crime laboratory technicians discovered a piece of 1½" pipe in the basement incinerator chute.

Defendant was taken into custody about 9:30 p. m. on February 25, 1963. A question and answer statement was taken by Assistant State's Attorney Bonaguro, with Court Reporter Flannery present, at about 5:00 a. m., February 26, 1963. At the trial the court reporter identified the written statement (People's exhibit 19) as an accurate transcript of his notes, which he transcribed on the morning of February 26. The defendant signed the statement around noon on February 26 in the State's Attorney's office. "Witnesses to signature" include Lester A. Bonaguro, John Loftus and Anton J. Bielski.

Defendant's statement, over objection, was admitted into evidence and read to the jury. The statement showed that defendant maintained an apartment on the fourth floor of 222 South Hamlin, and two or three nights a week the decedent would stay with him. She was married, and they planned on getting married when she obtained a divorce. On February 25, he arrived home at about 8:00 o'clock in the evening, and the decedent was in the apartment. They had a quarrel, and she called him a name, and "I just hit her before I know it." He hit her twice, and she fell to the floor. The pipe identified by him was 17¼" long and 1½" in diameter. After she fell to the floor, he saw blood coming from her hair. He tried to get a blanket out of the trunk to wrap her in and stumbled over the trunk with the body. He started to walk down the stairs with the body to take her to a doctor, when he met Daniels and his companions. He threw the pipe into the incinerator. He telephoned her sister and the police and told them to come out because "the girl was hurt real bad or dead I guess."

A police department microanalyst testified that from tests it was determined that the bloodstains on the trunk,

newspaper and defendant's clothing were human blood-stains. Human hair from the victim was the same as found in the trunk, and fatty tissue was found on the pipe. The coroner's pathologist testified that in his opinion "cranial cerebral injuries were the cause of Lee Ethel Weathington's death."

Defendant did not testify. In a hearing in mitigation and aggravation, it was disclosed that defendant was previously found guilty of voluntary manslaughter in 1955 and was sentenced to 14 years.

Initially, we consider defendant's contention that the trial court erred in failing to suppress his confession because (1) defendant's confession should have been suppressed because he had been denied "the assistance of counsel" in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States; (2) defendant's confession should also have been suppressed as involuntary under established pre-Escobedo standards: (a) defendant was not advised of any of his rights, including his right to remain silent; (b) no counsel was present when defendant's statement was taken; (c) defendant was denied medical care for his fractured ankle; (d) defendant did not voluntarily sign the statement; (e) the treatment of defendant while in custody negates voluntariness; (f) the unreasonable delay in presentment negates voluntariness; (g) the State failed to sustain the burden of proving that defendant's confession was voluntary; and (3) the admission of defendant's involuntary confession and its subsequent use at the trial leading to his conviction deprived defendant of due process of law.

The hearing of the motion to suppress any "oral or written confession" was heard on July 27, 1965. Witnesses for the State consisted of six police officers and Bonaguro and Flannery. The testimony of four police officers—Pelz, Steinmiller, Smith and Spellman—covered the period from the time the police found the defendant with

the body at 222 South Hamlin until he was turned over to Officers Miskulin and Barrett for interrogation. These four officers testified to questioning defendant about the body, during which defendant made no substantial admissions. He was not limping and made no request for medical care or for a lawyer.

Officer Michael Miskulin testified that he was assigned to Area 4, Homicide. He first saw the defendant in his apartment on the fourth floor at 222 South Hamlin on February 25, 1963, at about 9:30 p. m., and defendant asked Miskulin if he didn't remember him, and he had no further conversation with defendant in the apartment. He next saw defendant in Area 4 after 10:00 p. m. He interviewed defendant for about an hour. There was nothing unusual about defendant, and at no time did he tell of an injury to his ankle, and he did not ask for medical assistance or an attorney. "He did not mention an attorney at any time." He took defendant to a washroom, and on the way defendant stopped and talked to his sister. "He mentioned something about wanting to turn over car keys to his sister and he asked me if I would obtain those car keys from the officers whoever had them. I said that we would discuss that later, that we go to the washroom now and he left his sister and he went to the washroom and returned to the room." He was within hearing and eyesight of Harris for about three hours, either in the interviewing room or at the open doorway. Defendant did not ask to see anyone.

Officer Miskulin further testified that before the defendant was taken to the washroom, "I confronted him with the evidence that we had uncovered on this investigation. I told him that we had recovered the steel pipe out of the incinerator that he had used in this offense. I told him we had the trunk upstairs, a key from his pocket fit that same trunk, and I informed him we had everything there to link him with this homicide. He finally

told me he wanted to tell me just what took place. He told me that Ethel Lee Weathington was his girl friend. . . . They were seated at the kitchen table. They were arguing, he took this pipe and struck her twice over the head with it." Defendant told this to the officer between 11:30 and 12:00 p. m. on February 25, 1963.

After midnight, Miskulin telephoned the State's Attorney's office. Assistant State's Attorney Bonaguro arrived about 3:00 a. m., and a question and answer statement was taken. Miskulin testified, "I didn't sit in on the statement" that was taken at 5:00 a. m. Assistant State's Attorney Bonaguro, Court Reporter Flannery and Detective Barrett did. The last time Miskulin saw defendant was on the morning of the 26th. Miskulin also testified that Officer Barrett was on leave and out of the city on the day of the hearing of the motion to suppress.

Officer Anton J. Bielski (in rebuttal) testified that on February 26, 1963, he was assigned to the Homicide Unit, Area 4. He saw defendant on February 26, 1963, shortly before noon in the office of the State's Attorney. Present were his partner, John Loftus, and Assistant State's Attorney Bonaguro. Defendant was given a copy of a statement that had been given by defendant earlier that morning. After the statement was read by Mr. Bonaguro, defendant signed it and Officers Bielski and Loftus and Bonaguro signed it as witnesses. Defendant did not decline to sign or read it. He did not ask to communicate with anyone, nor did he ask for an attorney or medical attention. Bielski noticed that defendant had a slight limp, but defendant made no complaint about it.

Lester Bonaguro testified that he was an Assistant State's Attorney on February 26, 1963, and he arrived at Area 4, Homicide about 4:45 a. m. and took a statement from defendant with Court Reporter Flannery present. Bonaguro asked questions, and defendant gave an-

swers. He did not recall hearing defendant complain about an ankle or any other ailment or request to use the telephone or to consult an attorney.

Donald M. Flannery testified that he was a shorthand reporter for the State's Attorney's office. On February 26, he went to Area 4, Homicide at about 4:00 a. m. and took a statement at about 4:55 a. m. Those present were Bonaguro, Officer Barrett and the defendant. Bonaguro asked the questions and the defendant gave the answers. He had his notes with him, and they were marked as People's exhibit 3 for identification. The notes were transcribed on the morning of February 26, 1963, and People's exhibit 4 for identification was the statement given by defendant.

Defendant testified at the hearing on his motion to suppress that he arrived at the Maxwell Street station after 10:00 p. m. on February 25 and was taken to a small room for interrogation. He was handcuffed to a chair from the time he arrived until he left the station. He was interrogated by Officer Miskulin and then by Officer Barrett. While being interrogated, defendant asked Officer Miskulin for permission to make contact with his sister so she could arrange for legal counsel for him. He also asked to see a doctor about his ankle, which he had injured at work that day and which was swollen and had become very painful. Both requests were refused, and the defendant was told that he would not be able to make contact with anyone until they were "through" and then he could call his sister. Defendant also called attention to his injured ankle by exhibiting it to the officer and insisted that he was not going to give a statement. The officer told him that he would not be able to make contact with anyone until he had given a statement.

When Assistant State's Attorney Lester Bonaguro arrived at about 4:30 a. m. of February 26, 1963, defendant

told him that he was not going to give a statement and that he wanted to see a lawyer. Later defendant was in such unbearable pain that at 4:55 a. m. on February 26, he agreed to answer the Assistant State's Attorney's questions so that he could obtain medical care for his ankle. Defendant also said he was not allowed to call his sister until about 5:20 a. m. after the statement was taken, and that he was not allowed toilet privileges until after his sister arrived at 5:30 a. m.

Defendant testified that he was admitted to the Bridewell Hospital on the evening of February 26, 1963, where he was X-rayed and a cast was applied to his ankle, and he remained in the hospital until February 28, 1963, when he was taken from the Bridewell Hospital to the State's Attorney's office in order to sign the statement he made on February 26, 1963. When he refused to sign, he was "rolled around" sitting in back of the police truck, until 2:15 that afternoon. The police officers in charge of the truck told him they would bring him back when he made up his mind to sign the statement. By 2:00 p. m., defendant was "about froze" and agreed to sign the statement, which was done in the presence of Assistant State's Attorney Bonaguro and Officers John Loftus and Anton J. Bielski.

At the conclusion of the hearing on the motion to suppress, the trial judge said, after reviewing the evidence, "Now, I have to be aware of certain realities of life. The sister is sitting in the courtroom here, there hasn't been a scintilla of evidence from that area to contradict what the police have said. . . . She was there, there was some discussion about his car keys. The police said at that time he was taken and given an opportunity to go to the washroom. So I have to assume now that whatever transpired, certainly, was within the propriety of the police work."

The court made the following findings: "It is the Court's finding, based on this evidence as a matter of fact that this defendant did not ask at any time for any attorney. In fact, prior to any oral statements or prior to any written statements. I rather find as a matter of fact that defendant did not ask for any medical aid prior to making any oral statements or prior to making the written statement. I further find that the defendant was not coerced or put under duress in any form, and, consequently, my conclusion of law is that the confession, both the oral statements and the written statements are voluntary; that the defendant's constitutional rights have not been violated in any way. Consequently, the motion to suppress is denied and the oral and written statements in the form of confession are received in evidence."

Defendant argues that his trial was in December 1965, and the rule announced in Escobedo v. Illinois, 378 US 478 (1964) should have been applied here. Defendant asserts that he was taken into police custody at approximately 9:30 p. m. on February 25, 1963, and the investigation had begun to focus on him. He states, "Two police officers admitted questioning the defendant in his apartment. . . . [H]e was later questioned by 4 or 5 police officers while being held at the Fillmore Street station. Then he was transferred to Area 4, the Maxwell Street station, where he was interrogated by two detectives taking turns from about 11:00 P. M. on February 25 until almost 5:00 A. M. on February 26. During these six hours Detective Miskulin confronted defendant with what evidence had been discovered through the police investigation and allegedly succeeded in eliciting oral incriminating statements from defendant. Yielding to the pressures of this incommunicado detention and in order to obtain medical care for his fractured ankle, and to be allowed to call his sister, defendant finally agreed at 4:55 A. M. to answer questions posed by Assistant State's

Attorney Bonaguro, who had arrived at Area 4 at about 4:45 A. M."

The State contends that the failure to give defendant an affirmative warning of his right to remain silent and the absence of counsel does not require rejection of defendant's otherwise voluntary confession as a matter of law, although the trial court should have considered such attendant circumstances in determining the voluntariness and admissibility of defendant's confession. After examining this record and considering the authorities cited by both sides on the question of the admissibility of defendant's confession, we conclude the following pronouncements apply here.

People v. Lewis, 32 Ill2d 391, 393, 207 NE2d 65 (1965):

"In Escobedo the defendant had requested counsel and his request had been denied. In People v. Hartgraves, 31 Ill2d 375, we held that where there was no evidence that counsel was requested, a failure to warn the accused of his constitutional right to counsel and his right to remain silent did not render a confession inadmissible. The present case is governed by our decision in Hartgraves. There was no evidence of improper conduct and, in the absence of a request by the defendant, the failure of the authorities to advise him of his right to counsel and his right to remain silent does not render the confession inadmissible."

People v. Sims, 21 Ill2d 425, 428, 173 NE2d 494 (1961):

"Throughout these variations in phraseology there runs the dominant theme that, when the voluntary character of a confession has been timely and properly put in issue, all witnesses whose testimony is material to that issue should be called or their absence explained."

299

People v. Spencer, 27 Ill2d 320, 325, 189 NE2d 270 (1963):

> "Upon preliminary inquiry into the voluntary nature of a confession, the question of its competency is for the trial court alone to decide and, in making its determination, the court is not required to be convinced of its voluntary character beyond a reasonable doubt. On review, the decision of the trial court will not be disturbed unless manifestly against the weight of the evidence, or unless the court has clearly committed an abuse of discretion. . . . Here, the evidence was not only conflicting but that of defendant was in several material instances contradictory and unsatisfactory. Considering also the superior position of the trial judge to see and hear the witnesses and to assess their credibility, we cannot say that the decision to admit the confession into evidence as one voluntarily given was either against the manifest weight of the evidence or a clear abuse of discretion."

██ Applying the foregoing pronouncements to the trial court's denial of defendant's motion to suppress his confession, we conclude: (1) Although fourteen officers came in direct contact with defendant from the date of his arrest, February 25, 1963, at about 9:30 p. m., until he signed the statement at noon of February 26, 1963, all witnesses were called whose testimony was material to the issue of voluntariness. Officer Barrett's absence was explained at the time of the hearing of the motion, and we find defendant was not prejudiced by his absence. We note, also, that Barrett did testify at defendant's trial. (2) The court's findings are supported by substantial evidence and are not against the manifest weight of the evidence or a clear abuse of discretion. (3) Also, we find no error in the court's refusal

to admit into evidence defendant's Bridewell Hospital records from February 26 to February 28, 1963. The State objected to the admission on the grounds that it was hearsay. From this record, we believe the trial court properly sustained the objection.

In conclusion, we find no reason to disturb the trial court's denial of defendant's motion to suppress, and at the trial the court properly admitted into evidence defendant's written confession.

■■ Defendant also complains of the admission into evidence at his trial of certain exhibits of the State, which defendant asserts the State obtained as a result of an unreasonable search of defendant's apartment. After defendant was arrested and handcuffed in the first floor vestibule of the building, Officer Pelz and two other officers accompanied defendant to his apartment, and Officer Pelz took the apartment key from defendant's pocket and opened the door. The exhibits consist of a newspaper found in the apartment and a photograph taken of defendant's kitchen. Defendant argues both were obtained as a result of an unreasonable search of his apartment and in violation of his constitutional rights under the Fourth Amendment. We find no error here. Although defendant was arrested without a warrant, his arrest was lawful, and it included "the right to search the area within the defendant's immediate control, including the premises in which the person has been arrested." (People v. Braden, 34 Ill2d 516, 519, 216 NE 2d 808 (1966).) Under the circumstances portrayed here, the finding of the body in the vestibule and the open trunk on one of the stair landings, we believe the search of defendant's fourth floor apartment was not unreasonable.

Finally, defendant contends that the imposition of a minimum sentence of 19 years was unduly harsh because

the statutory maximum sentence for voluntary manslaughter was 20 years.

The State argues, "In the case at bar, the defendant's conviction was for taking his second life and it would be a grave injustice to permit a defendant with such propensities to return to society, especially in light of the provocation being by mere words of a woman." The sentence imposed upon defendant was within the statutory range and, after considering this record, we cannot say that this is a proper case to disturb the sentence imposed by the trial court.

Defendant also argues that "the trial court should not have taxed defendant with costs" because counsel was appointed to prosecute this appeal at no expense to defendant (Supreme Court Rule 607). As the State points out, section 180–3 (Judgment for costs) of Chapter 38 leaves no discretion in the court by the use of the word "shall." Therefore, the trial court properly ordered the defendant to pay all of the costs of the proceedings.

For the reasons given, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.