*In re* ALVA STIFF, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee.)

(No. 74-368;

Second District (1st Division)—October 17, 1975.

John F. McNamara, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (James W. Jerz, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Alva Stiff, then age 14, was adjudged delinquent based on findings that he was guilty beyond a reasonable doubt of one count of burglary, and of two counts of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1(a)(1),(3)). After a dispositional hearing the respondent was committed

to the custody of the Department of Corrections. He appeals, contending that the court erred: (1) in denying his motion for a change of place of trial or, in the alternative, for a substitution of judges; (2) in denying his motion to suppress his confessions; and (3) in finding him guilty on all three charges.

The victim was found dead in her home on March 21, 1973. Alva Stiff and a companion, Lydell Curry,[1] were placed in custody on that day. On April 2, 1973, Alva Stiff's attorney moved for a substitution of judges alleging that Judge Penniman, who had transferred the Curry case to the adult division, was prejudiced. The motion was granted and the case next appeared on the call of Judge Nielsen. On April 6, 1973, a motion was filed on behalf of Stiff for a change in the place of trial or, in the alternative, for the substitution of a judge from another county. It was alleged that it would be impossible for the respondent to receive a fair trial in the community because of adverse publicity and because the judiciary was involved personally and politically with the family of the murder victim. This motion was denied.

■■ The portion of the motion requesting a change of place of trial was properly denied under the provision of section 114—6(a) of the Code of Criminal Procedure which provides that "[a] defendant may move the court for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice against him on the part of the inhabitants that he cannot receive a fair trial in such county." (Ill. Rev. Stat. 1973, ch. 38, par. 114—6(a).) We assume the applicability of this provision to procedures followed under the Juvenile Court Act, for the Juvenile Court Act guarantees to minors the rights of adults "unless specifically precluded by laws which enhance the protection of such minors." (Ill. Rev. Stat. 1973, ch. 37, par. 701—2(3)(a).) Because the right to a change of place of trial is a procedural right if there is compliance with the criminal code and because it is a right which is not precluded by any provision of the Juvenile Court Act, it is, therefore, applicable to proceedings under the Juvenile Court Act.

We are not persuaded by the argument, however, that "inhabitants," who may be alleged to be prejudiced under section 114—6 of the Code of Criminal Procedure, include all of the county's trial judges who may preside in a bench trial, as well as potential jurors who may be called in criminal trials. In the cases in which a denial of a motion for a change of venue has been raised on appeal, reviewing courts have

---

[1] For additional factual background note the appeal of Lydell Curry who was tried as an adult reported in 31 Ill.App.3d 1027 (1975).

stated that the dominant factor in determining whether the motion was improperly denied is whether jurors were affected. (See, *e.g., People v. Berry,* 37 Ill.2d 329, 332-33 (1967); *People v. Allen,* 413 Ill. 69, 74 (1952).) The fact that the alleged prejudice of judges is specifically treated in section 114—5 of the Code of Criminal Procedure for automatic substitution of a judge or any two judges gives us further reason to conclude that judges were not intended to be included as "inhabitants." Moreover, it has been traditional to differentiate between "inhabitants of the county" and "judges" in interpreting change of venue provisions. See *Rosewood Corp. v. Transamerica Insurance Co.,* 57 Ill.2d 247, 251-53 (1974); *People v. Ehrler,* 114 Ill.App.2d 171, 178 (1969).

■■ The alternative motion for substitution of a judge from another county was also properly denied since it alleged the prejudice of more than two judges. Section 114—5 of the Code of Criminal Procedure allows for the automatic substitution of a judge or any two judges within ten days of the date the case is placed on trial, or for substitution of a judge at any time for specific cause shown. (See *Rosewood Corp. v. Transamerica Insurance Co.,* 57 Ill.2d 247, 253; *People v. Myers,* 35 Ill.2d 311, 326 (1966).) It should be noted that here defendant had already been allowed one motion for the automatic substitution of judges which was all that he was entitled to under that provision. (See Ill. Ann. Stat., ch. 38, § 114—5, Committee Comments (Smith-Hurd 1970). See also *Rosewood Corp. v. Transamerica Insurance Co.,* 57 Ill.2d 247, 252.) And it should be further noted that there was no particular allegation that Judge Nielsen was prejudiced which would have required a hearing under section 114—5(c) of the Code of Criminal Procedure. Ill. Rev. Stat. 1973, ch. 38, par. 114—5(c). See also *People v. Peter,* 55 Ill.2d 443, 458 (1973).

Alva Stiff next claims that the court erred in denying his motion to suppress his oral statement made to the police officers and his later statement at the police station which was reduced to writing.

The officers testified that on March 21, 1973, they were patrolling an area on the northwest side of Rockford and concentrating on the area surrounding Rockford West High School because there had been several recent burglaries in that area. Stiff and a black youth were observed walking in the area at approximately 11:30 a.m. on March 21, 1973. The officers said that their attention was directed to the youths because they appeared to be younger than high school age and should not have been out of school at that time, and because they seemed very interested in the movement of the squad car. The officers returned to the area and at approximately 12:20 p.m. again saw the boys running across lawns of houses in the area and as the squad car went around the block the

officers saw Stiff and his companion running out from between two houses. When the youths saw the police Stiff stopped but the other boy turned around and ran back between the houses.

One of the officers stated that at this point he called Stiff over to the car and the following conversation ensued. Stiff asked, "What did we do wrong?" To this inquiry the officer responded, "Why were you running?" Stiff responded, "If I tell you everything will I get in trouble?" And to this the officer answered, "It depends on what you have done."

Stiff was then placed in the back seat of the squad car and as soon as he was seated he volunteered, "I have a knife" and he then reached into his shirt, pulled out a knife and gave it to the officer. Then Stiff offered, "He has a gun and will use it," referring to the other companion who had run away. At this point the officers left the scene of Stiff's apprehension and proceeded to another street where they apprehended Lydell Curry. They placed Curry in the back seat of the squad car with Stiff and read to both boys the *Miranda* warnings. Both boys indicated that they understood their rights.

On cross-examination one of the officers stated that he had issued the request to come over to the squad car in a command tone and that they made it apparent to Stiff that he had to get into the car. The officer also testified on cross-examination that he would not have allowed Stiff to leave unless he and his partner were satisfied that Stiff had done nothing wrong. It was admitted that Stiff was not given the *Miranda* warnings at this time.

There was further testimony that on the way to the station Stiff volunteered, "Can I tell you something important" and that before the officer could respond Stiff continued, "We just tried to break into a house and there was an old woman present and while I was standing in the back door I heard her say something like what I thought was 'Hi' and I heard a shot." Stiff told the officer then, "You should check it out," and directed the officers to the decedent's house where upon investigation the body was found.

After the officers had discovered the body one of them came back to the car and read Stiff his rights from a card he kept in his wallet and asked him if he understood them. Stiff responded that he did, was asked whether he wished to talk, and answered affirmatively. He was then asked what had happened to the woman in the house and when the officer told him that she was dead Stiff began to cry. He did not say anything further on the way to the police station.

Stiff was taken to the police station and remained there for about an hour without begin questioned. The officers did not attempt to contact anyone to inform them that Stiff was in custody nor did the youth ask to

make a phone call. The officers testified that before taking a statement from the youth at the police station Stiff was again informed of his rights and given a written waiver to sign which he did after answering that he understood the waiver.

In the statement, Stiff said that he and Curry had not gone to school that day, and that at one point Curry had asked him if he felt like killing "something" and that Stiff said no. Curry had also asked him if he had enough nerve to point a gun at someone and pull the trigger and Stiff said no. Stiff in his statement related that after he and Curry had walked around looking for a home to break into, they finally came to the decedent's house where no one appeared to be home. He stated that both he and Curry went inside a porch and Curry found some keys on a window ledge which opened the inside door. Curry walked inside and started down a hallway while Stiff remained just inside the back door in the kitchen. Stiff saw Curry go into a room and heard a voice that sounded like a lady saying "Hi." He heard a gun shot and then he started running out of the house and down the street. In the statement Stiff added details of what Curry had told him.

It appears from the evidence that at some time while Stiff was in the police station one of the officers called a supervisor of the Rockford Children's Home where Stiff and Curry were residents and told him that there was a problem with several of his boys and that he should come down to the station. The supervisor testified that he came to the station and entered the room where Stiff was being questioned. He stated that he told Stiff that matters at that point were pretty much out of his hands but that he would do everything he could for him. Stiff did not request that he remain and he left without asking any questions about the contents of defendant's statement.

It was stipulated that, if called to testify, a doctor would state that pursuant to his examination of Stiff he found him to have a verbal I.Q. of 85 and a full scale I.Q. of 82 to 83 which meant that he functioned at the dull-normal level. It was also stipulated that a psychiatrist would characterize an I.Q. of between 70 and 85 as a "mild" degree of intelligence defect.

Stiff in his testimony confirmed that the officers had read his rights to him after Curry had joined him in the squad car but that he felt he did not understand them because of his anxiety. Stiff testified that later, after he had led the police to the decedent's home, he was again advised of his rights but that he neither remembered much of what the officers said or understood it. He said that on the way to the station and at the station prior to reading the waiver form he asked if he could make a phone call and received no response. He said that he did not understand the

waiver form but still agreed to sign it. On cross-examination it appeared that he did understand the substantive parts of the warnings but did not understand the meaning of all of the words.

Stiff argues that he was illegally detained initially; that because of his low intelligence he could not waive his rights or understand them, and that the failure to contact his parents or guardians or to have the juvenile officer present before questioning requires that the confessions be suppressed.

██ First, we cannot agree that the initial detention of the juvenile in the squad car was an illegal detention. The officers' acts were justified under section 107—14 of the Code of Criminal Procedure because of the suspicious behavior of the youths who would ordinarily have been expected to be in school and because of the officers' knowledge of the numbers of thefts which recently occurred in the area. See Ill. Rev. Stat. 1973, ch. 38, par. 107—14. See also *People v. Winslow*, 26 Ill.App.3d 1035, 1040-41 (1975); *People v. Thomas*, 9 Ill.App.3d 1080, 1081 (1973); *People v. Cribbs*, 8 Ill.App.3d 750 (1972).

██ We do not agree with respondent's argument that section 3—1 of the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, par. 703—1) presents the only circumstances under which the police may conduct a warrantless detention of a juvenile. However, even under that section the court could properly conclude that the officers had reasonable cause to believe that the minor was a delinquent.

Further, even if we were to assume, which we do not, that there was an illegal detention we would still conclude that the statement made in the squad car was voluntary under all the circumstances and therefore admissible. (See *People v. Zepeda*, 47 Ill.2d 23, 27 (1970).) When it clearly appears, as it does here, that the principal evidence objected to was volunteered by Stiff without police interrogation and that the further statements followed the giving of *Miranda* warnings, any causal connection between the allegedly illegal initial detention and the subsequent confession can be said to have been broken by the cumulative effect of the entire circumstances surrounding the statements. See *Brown v. Illinois*, 422 U.S. 590, 45 L.Ed.2d 416, 95 S.Ct. 2254, 2261 (1975).

The initial oral statements were properly found to have been volunteered and prompted only by general on the scene questioning and not custodial interrogation so that *Miranda* warnings were not required to be given to make them admissible. (See, *e.g.*, *People v. Hubbard*, 55 Ill.2d 142, 152 (1973); *In re Orr*, 38 Ill.2d 417, 423 (1967).) The later oral statements were made after the *Miranda* warnings had been given and were clearly admissible.

██ We further conclude from the totality of the circumstances that

the written statement at the police station was also voluntary and un-coerced. The finding of the trial judge that Stiff was able to comprehend the warnings and to effectively waive his rights is not against the manifest weight of the evidence. Further, even if we were to find otherwise, it clearly appears that the inculpatory information contained in the written confession was previously established by Stiff's oral admissions. Thus, even if there could said to be error in the admission of the written statement the error was harmless beyond a reasonable doubt since it did not prove an element of the crime which had not already been established by other properly admitted evidence. See *People v. Nicholls*, 44 Ill.2d 533, 539 (1970); *People v. Myles*, 132 Ill.App.2d 962, 965-66 (1971); *People v. Landgham*, 122 Ill.App.2d 9, 24 (1970).

■■ The respondent has argued that the police were in violation of section 3—2 of the Juvenile Court Act in not contacting the juvenile's parents and not taking him immediately to a juvenile officer upon his arrival at the police station. This section, in substance, provides that a law enforcement officer who takes a minor into custody without a war-rant shall immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care and shall without unnecessary delay take the minor to the nearest juvenile police officer. (Ill. Rev. Stat. 1973, ch. 37, par. 703—2.) He urges that we should adopt a new rule in regard to violation of this section and state that a juvenile cannot effectively waive his rights unless a parent or guardian is present at the time the waiver is made. In this connection he suggests that we follow the lead of the Indiana Supreme Court in *Lewis v. State*, 259 Ind. 431, 288 N.E.2d 138, 142-43 (1972). We do not feel at liberty to do so inasmuch as the Illinois Supreme Court has in juvenile cases as well as in adult cases taken the position that the voluntariness of a confession must be judged on the totality of the circumstances. See *People v. Smith*, 56 Ill.2d 328, 332 (1974); *People v. Steptore*, 51 Ill.2d 208, 215 (1972); *People v. Hester*, 39 Ill.2d 489, 497-98 (1968).

We state, however, that as a matter of good practice special precaution should be taken to insure that juveniles understand their rights and how to exercise them and that it would be preferable to make sure, whenever possible, that a parent or guardian is present when a juvenile waives his rights. In a close case the failure to follow this procedure may result in a finding that under the totality of the circumstances the waiver is ineffective.

■■ Respondent's final contention is that the judge found defendant guilty on all three counts. He contends first that the judge erred in finding him guilty of both burglary and felony murder since burglary is a lesser included offense of felony murder. He also contends that the find-

ing as to both felony murder and murder are erroneous since guilty verdicts on both of those counts are inconsistent. He therefore concludes that only the felony-murder finding should stand and that this will benefit him if he seeks the earliest possible release from custody.

We find no merit in his contention. It is true that in a criminal case a conviction of multiple offenses arising from the same conduct and not independently motivated would be vacated. (See *People v. Williams*, 60 Ill.2d 1, 13 (1975).) Here, however, the burglary was committed by the entry into the house intending a theft and the murder was committed by Curry when the victim unexpectedly was found in the house. It is, of course, true that Stiff in an adult proceeding could not be convicted of more than one murder when only one murder was committed. However, we are not faced with multiple convictions under the circumstances of this case. There was sufficient evidence to establish guilt of one act of burglary and a single act of murder with the necessary intention to be found either under accountability or under felony-murder principles. There were not three convictions here. There was a single adjudication of delinquency. The minor has therefore not been prejudiced by the form of the adjudication order.

The judgment is affirmed.

Affirmed.

GUILD and HALLETT, JJ., concur.