THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
DAVID GROLEAU, Defendant-Appellee.

First District (3rd Division)   No. 60848

Opinion filed December 16, 1976.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Michael Buckley Bolan, of Chicago, for appellee.

Mr. JUSTICE McGLOON delivered the opinion of the court:

On June 22, 1972 the dead body of a teenage girl was found in a field in Streamwood, Illinois. A 7-year-old boy's description of a youth seen fighting with a girl in the area where the victim's body was found and a name found in a notebook in the victim's purse led the police to defendant's home. Police officers questioned the defendant both at his home and later that same day while defendant was in custody at the police station. After a hearing pursuant to defendant's motion to suppress statements and confessions, the trial court ordered as follows: (1) that defendant's statements made at his home were admissible; but (2) that defendant's statements made while in custody at the police station were involuntary and therefore inadmissible. Pursuant to Supreme Court Rule 604(a)(1) (Ill. Rev. Stat. 1975, ch. 110A, par. 604(a)(1)), the State now appeals from that part of the trial court's order suppressing statements made by defendant while in custody at the police station.

The State contends on appeal that the trial court erred in ordering the above statements suppressed and argues that the trial court's ruling was premised on a faulty principle of law.

We affirm.

The first witness to testify at the hearing on the motion to suppress was Officer LaPlagia, a member of the Streamwood Police Department. Officer LaPlagia testified that on June 22, 1972, he arrived at a vacant area near Route 59 and Schaumburg Road and observed the body of a young female, lying face down on the ground. At this time the victim was dead. Officer LaPlagia then talked to a 7-year-old boy who stated that he had seen a young boy fighting with a girl in that area the same day. The seven-year-old then gave a description of the victim's attacker. Shortly thereafter Officer LaPlagia related this conversation to juvenile officers Schoening and Adams.

Officer Louis Schoening, also a member of the Streamwood Police Department, testified that he proceeded to the scene of the occurrence where he and Officer Adams met Officer LaPlagia. After meeting with

Officer LaPlagia and finding defendant's name in a notebook in the victim's purse, Officers Schoening and Adams along with detectives Smith and Keating proceeded to the defendant's residence.

Upon arriving at defendant's home, Officer Schoening asked the defendant if he had seen the victim that day. After defendant told the police officers that he had accompanied the victim as she collected for a "Walk on Hunger" and had showed her how to leave Streamwood, the officers brought defendant to the Streamwood Police Station for further questioning.

When the officers arrived at the station, Officer Schoening accompanied detectives Keating and Smith and the defendant into the Youth Bureau Office. After detective Smith advised defendant orally of his rights, Officers Keating and Smith, Volker and Schoening became involved in a conversation with defendant. Defendant stated that he took the victim to various houses where she collected money. When questioned about some scratches on his chest, defendant stated that he and the victim had been scuffling and that she had scratched him. The defendant further stated that as he was showing the victim out of town they stopped at defendant's cousin's house on Bartlett Road. During this period of questioning nobody physically abused the defendant.

After questioning the defendant, the police brought in various people to identify the defendant, took photographs and interrogated several witnesses. The defendant then slept for approximately 1½ hours.

Officer Schoening went on to testify that at approximately 2 a.m., he and Officers Volker and Keating initiated another conversation with the defendant. At this second conversation, the defendant said that he argued with and hit the victim and, contrary to his earlier statement, indicated that he went up Schaumburg Road where he left the victim. Defendant then stated that he was tired, would answer no further questions and wanted to see his lawyer. The police then stopped their interrogation and gave the defendant something to eat. During this second period of questioning which lasted about an hour, no one hit the defendant.

Officer Schoening further testified that he did not recall the defendant being alone in the room with one police officer. Schoening never talked to the defendant's father at the station and first saw him at around 2 a.m. Officer Schoening stated that neither he nor any of the other police officers in his presence ever told the defendant that the victim was in the hospital or that she had accused him of hitting her. Officer Schoening further stated that the defendant never replied in Schoening's presence that somebody is pulling your leg and that she had better tell the truth.

Officer Adams, a juvenile officer in the Streamwood Police Department, testified that he was present at the defendant's residence when defendant was asked to come to the police station. Officer Adams

did not recall Officers Schoening or Smith telling the defendant at that time that the victim was in the hospital or that the victim had said defendant had hit her in the head with a rock.

Shortly after arriving at the police station with the defendant, Officer Adams saw Mr. Groleau, the defendant's father, sitting in the front hallway but did not recall whether he saw him in the Youth Bureau Office. Officer Adams was not present during the initial stages of the first interrogation period and did not recall that Mr. Groleau was told to leave the Youth Bureau Office nor any statement by Mr. Groleau that he wished to obtain the services of a lawyer. Officer Adams never talked to Mr. Groleau.

Officer Adams went on to testify that Officer Smith was present during the latter portion of the first interrogation period and was doing most of the questioning. In response to Officer Smith's questions, defendant stated that he had been with the victim, that they had been fooling around and that she scratched him. Later, the defendant changed his story and stated that his mother had scratched him and then that he had had a bicycle accident. These statements were made probably before 11 p.m.

The next witness to testify for the State was Investigator Smith of the Cook County sheriff's police. Investigator Smith testified that at approximately 9:30 p.m. on the day of the incident, he arrived at the Groleau residence along with three other police officers. After the defendant stated that he knew the victim and had been with her that day, he was taken to the police station for further questioning. While at the defendant's home, Investigator Smith never told the defendant that the victim was in the hospital nor that she said the defendant had hit her in the head with a rock. He did tell the defendant that the officers wanted to talk to him because the victim was missing.

Investigator Smith further stated that after arriving at the police station, he saw the defendant and his father in the interview room. As Investigator Keating began to read defendant his constitutional rights, Mr. Groleau remarked that the situation was serious and that he was going to call his lawyer. Mr. Groleau told the defendant not to say anything. He then left the room and went to the hallway to use the phone or phone book. After Investigator Keating finished reading the defendant his rights, the defendant made a statement concerning the homicide under investigation.

Investigator Smith further testified that during this time Mr. Groleau was not barred from the interview room nor did Mr. Groleau make any attempt to reenter the interview room. During this time nobody abused the defendant. Although the victim was already dead, defendant was told during this first interview that she was unconscious and in the hospital.

Investigator Smith went on to testify that he was present at a second conversation with the defendant that began approximately 2 a.m. Officer

Adams and Investigator Volker were also present. As Investigator Volker questioned defendant, defendant stated that he hit the victim with his fist and left her lying on the ground in the woods. After further questioning, defendant stated that he was tired and wanted to see a lawyer. No further questioning occurred. During this second session of questioning, Investigator Smith did not advise defendant of his rights.

Defendant, 16 years old at the time of the incident, testified that at approximately 9:45 p.m. the evening of June 22, 1972, four police officers arrived at his home. Officer Schoening asked him if he had seen or been with the victim that day. Defendant replied that the victim had been at his house and that he had escorted her around the neighborhood where she was collecting for a "Walk on Hunger." Both defendant and the victim were on bicycles and he showed her how to get to her home in Elgin. Officer Schoening then stated that the victim had accused him of hitting her in the head and that she was then in the hospital. Defendant denied hitting the victim. After three police officers accompanied defendant's father to a shed alongside the house to look at some bicycles, defendant was taken to the Streamwood Police Station.

Upon arrival at the police station, defendant was escorted to an office where he remained accompanied by four police officers for 15 minutes with the door closed. Defendant's father then entered the office and spoke with the defendant. When told to leave, Mr. Groleau stated that he had a right to be there because his son was a minor. One of the officers told Mr. Groleau that he had better read his law and again directed the father out of the office.

Defendant was then questioned by Officer Smith about his activities during the day. After this initial questioning period which lasted between 1½ and 2 hours, Officer Volker escorted the defendant outside of the office, directed him in a certain direction, and had him turn and stand at different angles. Officer Volker then accompanied the defendant back into the interview room. This procedure occurred approximately four times in the period of an hour. Defendant said the officers advised him of his constitutional rights in the early morning hours after he was questioned, about 5 hours after being brought into the station. Officer Volker read them to him. After being so advised he signed a waiver of rights form. Defendant denied it was signed at 2200 hours or 10 o'clock on the evening of the 22nd, and further stated that the time was not written on the paper when he signed it. Defendant only skimmed the writing on the form, not really reading it but believed it said what the officer had told him. He signed the form because the officers told him he had to sign it, not because its contents were true. Defendant said he was physically abused between 11 p.m. and 2 a.m.

Defendant's father, Mr. Robert Groleau, testified that at approximately

9:45 p.m. the evening of June 22, 1972, a group of police officers arrived at the Groleau residence and Mr. Groleau invited two of the officers, Officers Schoening and Adams, inside. Officer Schoening told the defendant that the victim was in the hospital and that she had accused the defendant of hitting her. Defendant responded that he did not do anything. After the officers looked at some bicycles in a shed adjoining Mr. Groleau's house, they informed Mr. Groleau that they were taking his son to the police station. Mr. Groleau told the police officers he would be down to the police station immediately.

When Mr. Groleau arrived at the police station, he asked the receptionist if he could see his son and was told he would have to wait. Mr. Groleau then exited the building, reentered through the back door, and went into Sergeant Schoening's office where the defendant was seated in the presence of four or five police officers. Mr. Groleau talked to his son for about 10 minutes. During this conversation, the defendant told his father that he was being accused of hitting the victim and denied having done anything. Mr. Groleau was then asked to leave the room by Officer Volker. Mr. Groleau protested, stating that his son was a minor and that he had a right to be there with his son. Officer Volker told Mr. Groleau that he had better read his law and again told Mr. Groleau to leave the room. As he was leaving, Mr. Groleau told his son not to say or sign anything, that he was going to get their lawyer, and to wait until he returned. Mr. Groleau further testified that while he was with his son, nobody advised his son of his rights.

Mr. Groleau remained outside the door to the office for about 10 minutes until told by a lieutenant of police that he had to leave. Mr. Groleau then went out into the hallway and made several phone calls in an attempt to reach his attorney. At around midnight and after five or six telephone calls, Mr. Groleau finally reached his attorney who called the police station shortly thereafter. During this period of time, Mr. Groleau repeatedly asked the receptionist and Officers Smith and Schoening if he could see his son. None of these people ever responded directly to Mr. Groleau's requests. Finally one police official told Mr. Groleau that his son was being taken to the Niles Police Station to avoid photographers and reporters. After his initial 10-minute conversation with his son, the next time Mr. Groleau saw his son was at about 9 a.m., June 23, 1972, at the Niles Police Station.

Mr. Groleau further testified that no police official ever informed him of the charges against his son and that he first learned of the victim's death at about 7 a.m. on June 23, 1972, from Sergeant Singer of the Cook County sheriff's police. Prior to being so informed by Sergeant Singer, the witness overheard a portion of a phone conversation by a reporter who stated that

the victim was dead and the defendant was being held. This occurred at approximately 2 a.m.

After hearing the above testimony and arguments of counsel, the trial court denied the motion to suppress relative to statements made at defendant's home and granted said motion relative to defendant's statements made while in custody at the police station. In this appeal the State asks that that part of the trial court's order granting the motion to suppress defendant's statements made while in custody at the police station be vacated because it was based on the following faulty principle of law:

> " * * * that if any defendant who is only 16 years old makes a statement to the police outside the presence of his parent and without being told the exact nature of the charge, then *ipso facto* such a defendant is presumed incompetent to voluntarily waive his constitutional rights."

It is true, as the State indicates, that the trial court made the following statement in explaining its ruling:

> "For us to say that there could be a knowing waiver by a sixteen year old, who is advised of certain rights at 10:00 o'clock, when he doesn't know the full import, and, when the father is being excluded all those hours, and he is being interrogated by different police officers and a long period of time elapses, I find it impossible for me to say that he could have any knowing waiver of any rights at that time."

However, the record reveals that the trial court described in detail the various factors surrounding defendant's statements. Among the factors mentioned by the trial court were the following: that neither the defendant nor his father were told the full consequences of the interrogation; that they were led to believe it was not a serious matter; that in fact neither was told the victim was dead; that the defendant was told the victim was in the hospital or missing; that the father, although present at the police station, was excluded from the interview room; that the defendant, 16 years old at the time, was advised of certain rights at 10 o'clock and then questioned over a long period of time by various police officers.

■■ Furthermore, in concluding his reasoning, the trial court stated:

> "So, I find that in the context of the whole totality of the circumstances * * * these particular facts don't point out to me a voluntary, intelligent waiver of rights based on everything that came before me."

The proper standard to be used in determining whether a defendant has voluntarily waived his constitutional rights is one which involves a

consideration of the totality of the circumstances under which a statement is taken and no single factor is controlling. *People v. Glanton* (1975), 33 Ill. App. 3d 124, 338 N.E.2d 30.

In *People v. Ramirez* (1968), 92 Ill. App. 2d 341, 348, 235 N.E.2d 412, 415, this court noted as follows several basic rules which should guide the reviewing court in determining the propriety of a trial court's ruling on a motion to suppress a confession:

> " * * * [I]n passing upon the entirety of circumstances surrounding the rendition of [a] confession, our court will lend considerable credence to the findings of the trial judge who saw and heard the witnesses as to matters of credibility. It is a determination which will not ordinarily be disturbed on review, absent some abuse of judicial discretion or unless shown by the attacking party to be contrary to the manifest weight of the evidence. *People v. Hudson*, 38 Ill. 2d 616, 233 N.E.2d 403 (1968); *People v. Hall*, 38 Ill. 2d 308, 231 N.E.2d 416 (1967); *People v. Spencer*, 27 Ill. 2d 320, 189 N.E.2d 270 (1963)."

■■ There is no single factor which will *per se* render defendant's statements inadmissible. The fact that a defendant is a minor does not standing alone preclude a waiver of his *Miranda* rights. (*In re Bizzle* (1976), 36 Ill. App. 3d 321, 343 N.E.2d 633.) Likewise, the failure to have a parent or guardian present during the questioning of a juvenile does not necessarily render his statement inadmissible. (*In re Stiff* (1975), 32 Ill. App. 3d 971, 336 N.E.2d 619, 625.) However, as stated in *Stiff*:

> "[A]s a matter of good practice special precaution should be taken to insure that juveniles understand their rights and how to exercise them and that it would be preferable to make sure, whenever possible, that a parent or guardian is present when a juvenile waives his rights. In a close case the failure to follow this procedure may result in a finding that under the totality of the circumstances the waiver is ineffective." 32 Ill. App. 3d 971, 978.

An additional factor present in the instant case is the alleged "trickery" used by the police in telling the defendant initially that the victim was missing and later that she was unconscious in the hospital when, in reality, the police had found her dead at the scene of the homicide. Citing *People v. Smith* (1969), 108 Ill. App. 2d 172, 246 N.E.2d 689, the State argues that the mere fact that the police did not inform defendant that the victim had died did not constitute trickery. While the State correctly cites the rule in *Smith*, the conduct of the police in the instant case exceeded that of the police in *Smith*. In the instant case not only did the police fail to inform the defendant that the victim had died, but they also affirmatively misrepresented her condition.

■■ It is clear from our reading of the record that the trial court based

its decision on the totality of the circumstances surrounding the rendering of the statements. The trial court specifically stated this standard and noted the circumstances under which the statements were given. Considering the totality of the circumstances, as did the trial court, we cannot say that the trial court's ruling is against the manifest weight of the evidence or that said ruling shows an abuse of discretion.

For these reasons we affirm that part of the trial court's order granting defendant's motion to suppress statements and confessions made while in custody at the police station.

Order affirmed.

McNAMARA, P. J., and MEJDA, J., concur.